UNITED STATES of America,
Plaintiff-Appellant,

v.

John THOMPSON, Steven Barfield, and
Kim Williams, Defendants-Appellees.

No. 81–5952.

United States Court of Appeals,
Eleventh Circuit.

Aug. 1, 1983.

Stanley Marcus, U.S. Atty., Robert J. Bondi, Asst. U.S. Atty., Miami, Fla., Frank J. Marine, Atty., Appellate Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Robyn J. Hermann, Asst. Federal Public Defender, Thomas G. Sherman, Miami, Fla., Peter Kahn, David Povich, Robert N. Chatigny, Washington, D.C., for defendants-appellees.

Before VANCE and ANDERSON, Circuit Judges, and SCOTT,* District Judge.

VANCE, Circuit Judge:

The government appeals an order of the district court for the Southern District of Florida suppressing evidence, approximately 2,000 pounds of marijuana, which the Coast Guard seized from defendants' United States registered vessel in international waters. We have jurisdiction under 18 U.S.C. § 3731.

## I. FACTS

On the afternoon of October 24, 1980, the defendants were aboard a 27 foot single cabin sailboat,[1] a noncommercial American flag vessel bearing a Florida registration number on her side, in international waters in the Straits of Yucatan. At that time the United States Coast Guard cutter STEADFAST was engaged in a three week law enforcement patrol of those waters aimed at interdicting drug smuggling into the United States. The STEADFAST was under an administrative directive to board every American vessel under 400 feet in length. At approximately 2:30 p.m. the STEADFAST sighted the defendants' vessel. While approaching to verify its name and flag, Coast Guard officials noticed that the vessel was riding "extremely low" in the water. Shortly thereafter, an armed party from the STEADFAST, led by Ensign Michael S. Black, boarded the defendants' sailboat under instructions to determine the ownership of the boat, to check its watertight integrity, and to perform a routine document and safety inspection.

Upon questioning, defendant John Thompson identified himself as the master of the vessel. Ensign Black told Thompson his vessel was being boarded pursuant to 14 U.S.C. § 89(a)[2] to ensure compliance with

---

* Honorable Charles R. Scott, U.S. District Judge for the Middle District of Florida, was a member of the panel that heard oral arguments but due to his death on May 12, 1983 did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

1. The vessel was a "Watkins 27" sailing sloop. Its cabin extends from the bow to just forward of the cockpit, and contains a V-berth, a head and shower, a hanging locker, racks on either side which serve as seats and sleeping accommodations, a galley and a quarter-berth.

2. 14 U.S.C. § 89(a) provides in relevant part:

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance....

applicable federal laws. Black then asked Thompson to produce the vessel's registration papers [3] and to unlock the cabin door, which was secured by a combination lock. Thompson refused to produce any documentation for the boat or to unlock the cabin door, asserting that the Coast Guard had no jurisdiction over his vessel while it was on the high seas. Black then explained that he had statutory authority to examine the registration papers and to search the boat pursuant to routine procedures established for such boardings. Black repeated his request that Thompson produce the registration and unlock the cabin door, but again Thompson flatly refused, arguing that it would be an invasion of his privacy. At some point defendant Kim Williams asked Thompson to allow Williams to enter the cabin alone and retrieve the registration papers. Thompson did not respond to Williams' request and Black renewed his demand that Thompson unlock the cabin door and produce the registration.

Following Thompson's refusal to comply, Ensign Black sought and received permission from his superior officer to place all three defendants under arrest for impeding a Coast Guard boarding, in violation of 18 U.S.C. § 111 and/or 46 U.S.C. § 1483. During transfer of the defendants from the sailboat to the Coast Guard cutter, Thompson jumped into the water. Williams and Barfield were then handcuffed and seated in the rear of the boat. All three were subsequently transferred to the STEADFAST.

Ensign Black was then directed to open the cabin door and check the watertight integrity of the vessel. Black cut open the combination lock with a bolt cutter. Upon removing the first of the interlocking boards covering the cabin door Black detected the "strong aroma of marijuana." After entering the cabin, Black noticed, stacked in the center and through the forward berth, several bales of what later proved to be marijuana wrapped in green plastic and partially covered by a blanket. The boarding party then conducted a thorough search of the cabin as well as the engine compartment.

The defendants were subsequently indicted on the charge of possession with intent to distribute marijuana while on board a United States registered vessel, in violation of 21 U.S.C. § 955a. Prior to trial, the defendants joined in a motion to suppress the seized marijuana.

Following an evidentiary hearing, the district court granted the defendants' motion. The district court saw no impropriety in the Coast Guard's stopping and boarding the defendants' vessel, but concluded that the subsequent forced entry and search of the cabin where the marijuana was located were unreasonable within the meaning of the fourth amendment to the United States Constitution.

## II. UNTIMELY ISSUES

At the suppression hearing, the government relied exclusively on the position that the entry of the cabin was permissible as part of an authorized document and safety inspection. On appeal, the government also argues: that there existed probable cause or reasonable suspicion of the presence of contraband prior to entry of the cabin; that entry of the cabin was permissible as part of an inventory search or a search incident to an arrest; and that even if the entry of the cabin violated the defendants' fourth amendment rights, the suppression order nonetheless should be reversed under the "good faith" exception to the exclusionary rule established in *United States v. Williams,* 622 F.2d 830 (5th Cir.1980) (en banc), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981).

---

**3.** Most undocumented vessels must have a number issued by the proper issuing authority in the state where the vessel is principally used. *See* 46 U.S.C. § 1466; 33 C.F.R. § 173.15(a) (1980). Such vessels are issued a pocket-size "certificate of number," which must be carried aboard the vessel during use and must be presented to any federal, state or local law enforcement officer for inspection at his request. *See* 46 U.S.C. § 1469(a); 33 C.F.R. §§ 173.21–25 (1980).

■ Of these alternative theories of admissibility, all but one—the "reasonable suspicion" rationale—are raised for the first time on this appeal, and as such are not properly before this court. *See Steagald v. United States,* 451 U.S. 204, 208–11, 101 S.Ct. 1642, 1646–47, 68 L.Ed.2d 38 (1981), *on remand,* 664 F.2d 1242, 1243 (5th Cir.1981); *United States v. Richards,* 646 F.2d 962, 963 (5th Cir.), *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981); *United States v. Hicks,* 624 F.2d 32, 34 (5th Cir. 1981).

■ The claim of "reasonable suspicion" was first advanced by the government in a petition for reconsideration filed seventeen days after the district court entered its suppression order and more than five months after the evidentiary hearing was held.[4] The record of the suppression hearing reveals that government counsel not only failed to argue the existence of reasonable suspicion, but expressly conceded the issue.[5] On that basis, the district court declined to consider the "reasonable suspicion" issue when ruling on the suppression motion.

The government has offered no justification for its failure to raise and develop the issue at the suppression hearing. In denying the government's postorder motion, the district court ruled, in effect, that the government waived its right to raise the reasonable suspicion issue. We agree that by failing to raise the issue at the suppression hearing without offering any justifica-

tion therefor, the government waived its right to assert it in subsequent proceedings. *See Steagald v. United States,* 451 U.S. at 209, 101 S.Ct. at 1646 ("The Government ... may lose its right to raise factual issues of this sort before this Court when it has made contrary assertions in the courts below, when it has acquiesced to contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation"); *Fehlhaber v. Fehlhaber,* 681 F.2d 1015, 1030 (5th Cir. 1982) (Unit B), *quoting Excavators & Erectors, Inc. v. Bullard Engineers, Inc.,* 489 F.2d 318, 320 (5th Cir.1973) ("[A]n argument first raised in a post-judgment motion 'is simply too late' and need not be addressed on appeal"); *United States v. Greely,* 425 F.2d 592, 593 (D.C.Cir.1970) ("The government cannot relitigate the issues resolved by a suppression order without advancing some justification for its failure to develop those issues fully at the initial hearing").

## III. THE SEARCH WAS PERMISSIBLE AS A DOCUMENT AND SAFETY INSPECTION

■ Accordingly, we consider only whether the search was justified as a document and safety inspection. Neither probable cause nor reasonable suspicion is necessary for the Coast Guard to stop and board American vessels on the high seas and to inspect them for safety, documentation, and obvious customs and narcotics violations under the authority of 14 U.S.C. § 89(a).

---

**4.** The government's petition for reconsideration candidly states:

> In the context of the motion to suppress hearing Government counsel believed that Section 89(a) and/or a lack of standing were sufficient arguments upon which to urge a denial of defendants' motion to suppress. With the benefit of hindsight, after having read the transcript of the hearing ... the United States respectfully urges this Court to entertain the following argument vis-a-vis reasonable suspicion of criminal activity ....

**5.** The exchange between Judge Eaton and Mr. Weiss, the Assistant United States Attorney, was as follows:

> THE COURT: ... [B]ut there is no need to argue reasonable suspicion tests and that

sort of thing, because, correct me if I am wrong, Mr. Weiss, there is no question there in the government's mind that these people did not suspicion criminal activity, that they are out there on a marijuana mission, quite naturally, but that these people say they went below and tore up the lock because they wanted to check to see if it was taking on water.

Now that might be a superficial approach to it, but correct me if I am wrong. Is that the position?

MR. WEISS: Yes, that is the position, except that I would add that they also wanted to go in and check other safety features on the vessel.

United States v. Bent, 707 F.2d 1190, 1193 (11th Cir.1983); United States v. Ceballos, 706 F.2d 1198, 1200 (11th Cir.1983); United States v. Stuart-Caballero, 686 F.2d 890, 892 (11th Cir.1982); United States v. Clark, 664 F.2d 1174, 1175 (11th Cir.1981); United States v. Freeman, 660 F.2d 1030, 1033–34 (5th Cir.1981) (Unit B), cert. denied, —— U.S. ——, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982); United States v. Mazyak, 650 F.2d 788, 790 (5th Cir.1980), cert. denied, 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); United States v. Warren, 578 F.2d 1058, 1064–65 (5th Cir.1978) (en banc), cert. denied, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). The government argues that, under the circumstances of this case, it was necessary to enter or look into the cabin to conduct a proper inspection and when the defendants refused to grant permission to do so, the Coast Guard was justified in removing the lock from the cabin door. Appellees maintain that the locked cabin was a private sleeping quarters in which they had a legitimate expectation of privacy, and that, as the government concedes absence of reasonable suspicion, the search violated their fourth amendment rights.

The district court characterized the single cabin on the defendants' boat as a "mixed cabin" because it could serve equally well as living quarters or as a cargo hold or as both. It held that when confronted with a "mixed cabin," a Coast Guard officer must assess the permissible scope of his activities on the basis of "outward appearances and objective manifestations of use and expectation." If it is not outwardly discernible that the cabin is being used as "mere stowage," then the officer "must defer to the tenable privacy interests of those on board." Finding that the defendants manifested their expectation of privacy by placing the lock on the cabin door, and there was "no outward indication that the cabin was other than ordinary living quarters," the district court held that the defendants had a legitimate expectation of privacy in the cabin.

Further, the district court found that the Coast Guard's claim of entering the cabin to conduct a document and safety inspection was a mere "pretext" because the real purpose was to search for contraband. Because the Coast Guard's decision to enter the cabin was premised upon defendants' having legitimately asserted their constitutional right to privacy by locking the cabin door, and the government conceded that "no suspicion whatever existed to search the cabin for contraband," the court concluded that the search was unreasonable.

The court also reasoned that, even if the Coast Guard's purpose was to conduct a safety and document inspection, search of the mixed cabin would only be within the fourth amendment if there was a reasonable basis to suspect some safety or document violation and the means used to effect entry were not unreasonably intrusive.

■■■ We believe the decision of the district court was premised upon a misunderstanding of United States v. Williams, 617 F.2d 1063 (5th Cir.1980) (en banc) and progeny. Although we recognized in Williams that a suspicionless section 89(a) search is limited by the reasonableness requirement of the fourth amendment, we did not hold that a search is reasonable only if it does not intrude upon areas where someone has a legitimate expectation of privacy. Rather, Williams established two tests. Under Williams, a document and safety inspection search is constitutionally reasonable by virtue of its statutory authority and requires no antecedent suspicion of wrongdoing. Id. at 1086. We emphasized in Williams that "it follows that no one ... could conceivably have any legitimate expectation of privacy with regard to any objects that would be in the plain view (or smell) of someone conducting" a safety or document check. Id. By contrast, a section 89(a) investigatory search to look for contraband or other evidence without at least a reasonable suspicion is constitutionally reasonable only in nonprivate areas of a vessel. Id. at 1086–87. Accord United States v. Robbins, 623 F.2d 418, 420 (5th Cir.1980). As we stated in Williams:

A section 89(a) search of those "private" areas of the hold of either an American

or foreign vessel in international waters for the purpose of finding contraband or other evidence of criminal activity, when there is no reason to suspect that the items being sought will be found there, is today unreasonably intrusive.

617 F.2d at 1086.

■ The district court apparently applied the second test, partly because it found that the document and safety inspection was a mere pretext for a search for contraband. We have elsewhere rejected the argument that where a search is reasonable as a document and safety inspection, the subjective motives and suspicions of the Coast Guard boarding party will render it invalid as a mere pretext. *United States v. Baker,* 609 F.2d 134, 139–40 (5th Cir.1980) ("An investigating officer's suspicion that contraband may be discovered does not invalidate an otherwise valid search, where it is clear that the procedure is valid, and is not merely a pretext for a search"). In *United States v. Bustos-Guzman,* 685 F.2d 1278, 1280 (11th Cir.1982) and *United States v. Willis,* 639 F.2d 1335, 1337 (5th Cir.1981) we held that the:

> defendants could not have any reasonable expectation of privacy protected by the Fourth Amendment in an area where the Coast Guard's presence is authorized, *regardless of the subjective expectations or intent of the boarding party.*

(emphasis added).[6] The lawfulness of a document and safety inspection is not vitiated even if "the officer in charge had mixed purposes, both to make a document and safety check and to search for contraband," *United States v. Kent,* 691 F.2d 1376, 1383 (11th Cir.1982). *Accord United States v.*

*Jonas,* 639 F.2d 200, 203 (5th Cir.1981) (Unit B).

■ Under the plenary authority of section 89(a) the Coast Guard can conduct a suspicionless entry and search of those parts of a vessel which must be inspected to accomplish an ordinarily competent document and safety inspection. The subjective intent of the Coast Guard boarding party is immaterial. Regardless of the defendants' legitimate expectations of privacy in the area for other purposes, when the Coast Guard legitimately seeks entry to an area of the vessel reasonably necessary for the conduct of a document and safety inspection, less intrusive means are not required because section 89(a) authorizes the use of "all necessary force to compel compliance."

■ We have expressly refrained from concluding that the area necessary for the proper conduct of a document and safety inspection includes individual private living quarters. *United States v. DeWeese,* 632 F.2d 1267, 1271 (5th Cir.1980), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981). But, as we have elsewhere held, it does include authority to conduct a suspicionless search of the only cabin aboard a small vessel which must, of necessity, serve multiple functions. In *United States v. Clark,* 664 F.2d at 1075, we held that authority to conduct a document and safety inspection under section 89(a) included authority to order the defendants to open the door to the cabin of their 30-foot vessel. We reasoned:

> The Coast Guard was also justified in ordering Clark to open the door to the ship's cabin because an inspection of the

---

**6.** Decisions of several other federal circuits have also rejected the "pretext" argument in favor of an objective standard. *See, e.g., United States v. Arra,* 630 F.2d 836, 845–46 (1st Cir.1980) ("[W]e do not think the motivation for a particular boarding is relevant where, as here, an objective basis for conducting the document and safety check existed .... We would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers"); *United States v. Watson,* 678 F.2d 765, 769–71 (9th Cir.1982), *cert. denied,* —— U.S.

——, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982); *United States v. Demanett,* 629 F.2d 862, 868–69 (3d Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). *Cf. Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) ("fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action").

cabin would be a routine part of any safety and documentation inspection.

*Id.*

We find the relevant facts of this case (forced entry of the single cabin of a 27-foot sailing sloop to conduct a document and safety inspection) to be indistinguishable from those in *Clark*. Although we recognize the symbolic significance of the combination lock on the cabin door to the defendants in this case, we cannot conclude, as the district court did, that this leads to a presumption that the solitary cabin is "no[thing] . . . other than living quarters."

Rather, we agree with the view expressed by the first circuit in *United States v. Green,* 671 F.2d 46 (1st Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982) that:

> the fact that the crew also bunked in the cabin below would not render the cabin generally off limits to searching officers on a boat of this size and character, where virtually all shipboard functions might be expected to take place in the cabin area, including stowage of some cargo.

*Id.* at 53 n. 11.

■ Under the circumstances present in this case, completion of several points of a routine document and safety inspection would reasonably have required the crew of the STEADFAST to enter the defendants' cabin. First, because the defendants failed to produce the vessel's certificate of number, which they were required by law to carry and present to the Coast Guard for inspection upon request, it was reasonable for Ensign Black to assume that the certificate was in the cabin below, especially in light of defendant Williams' request that defendant Thompson permit him to go below and retrieve the vessel's documents. Considering Thompson's noncompliance with Black's request and his persistent refusal to cooperate in any way, we think the Coast Guard's authority to enter the cabin to search for the certificate of number was comparable to its authority while inspecting documented vessels to go below deck to look for the main beam number. *See United States v. Williams,* 617 F.2d at 1086; *United States v. Cortes,* 588 F.2d 106, 111 (5th Cir.1979); [7] *cf. United States v. Hillstrom,* 533 F.2d 209, 210–11 (5th Cir.1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977). The defendants contend that Ensign Black was under a duty to accept Williams' offer to go below alone. The record shows, however, that Williams addressed only Thompson and that Thompson, the "master" of the vessel, did not respond.

Second, travelers on the high seas are required to carry aboard their vessels numerous safety devices, such as fire extinguishers, life preservers and visual distress signals, all of which must comply with regulatory specifications and standards. *See* 46 U.S.C. § 1454; 46 C.F.R. §§ 25.30–1 to .30–20; 33 C.F.R. §§ 175.11–.23; 33 C.F.R. §§ 175.101–.140. Since the defendants displayed no such equipment on deck, the Coast Guard could not reasonably have determined whether the required equipment was aboard and in proper repair unless the cabin door was opened. Faced with the defendants' failure to cooperate, the Coast Guard was justified in removing the lock to gain access to the cabin.

■ Third, the Coast Guard was authorized to inspect for certain especially hazardous conditions. *See* 46 U.S.C. § 1462; 33 C.F.R. § 177.07. In this connection, we think the Coast Guard's observation that the vessel was riding unusually low in the water entitled the boarding party to attempt to ascertain the cause as part of a reasonable document and safety inspection. While the vessel's low ride was not unequivocal evidence that the vessel was taking on water, it was sufficient under the circumstances to justify an administrative entry of the cabin to check for watertight

---

**7.** A documented vessel has an official number obtained from the Coast Guard which is permanently affixed to the main beam. *See* 46 C.F.R. § 67.15–1 (1980). The certificate of number of an undocumented vessel, *see* n. 3, *supra,* serves a comparable purpose.

integrity.[8] *Cf. United States v. Hicks,* 624 F.2d at 33. In any case, the other reasonable explanation for this condition was that the cabin was loaded with cargo. An outward indication of cargo stowage would authorize the Coast Guard to inspect for documentation compliance, since the defendants' vessel evidently "was not licensed to carry cargo of any kind." *United States v. Hillstrom,* 533 F.2d at 211. *See* 46 U.S.C. § 103.

The importance and reasonableness of the Coast Guard's plenary power to conduct regulatory inspections on the high seas has long been recognized. The authority presently vested in the Coast Guard under section 89(a) can be traced to an enactment of the First Congress, the same Congress which proposed the fourth amendment. That act expressly authorized revenue service officers to board United States vessels "for the purpose of demanding the manifest aforesaid, and of examining and searching the said ships or vessels; and the said officers respectively shall have free access to the cabin, and every other part of a ship or vessel." Ch. 35, § 31, 1 Stat. 164 (1790). This original enactment is persuasive evidence that document and safety inspections of the sort routinely performed by the Coast Guard today, without any suspicion of wrongdoing, are not "unreasonable" as the word is used in the fourth amendment. *See United States v. Williams,* 617 F.2d at 1079–81; *United States v. Watson,* 678 F.2d 765, 773–74 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982); *cf. United States v. Ramsey,* 431

U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977); *Boyd v. United States,* 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886).

As the Supreme Court recently stated, in speaking of 19 U.S.C. § 1581(a), the historically related statute which provides comparable authority to customs officers:

> In a lineal ancestor to the statute at issue here the First Congress clearly authorized the suspicionless boarding of vessels, reflecting its view that such boardings are not contrary to the Fourth Amendment; this gives the statute before us an impressive historical pedigree.

*United States v. Villamonte-Marquez,* —— U.S. ——, ——, 103 S.Ct. 2573, 2578–80, 77 L.Ed.2d 22 (1983).

In addition to the obvious public interest in safety and the government's interest in identifying vessels flying the United States flag, international law obligates the United States to regulate the operation of its flag vessels on the high seas. *See* Convention on the High Seas, Sept. 30, 1962, arts. 5, 10, 13 U.S.T. 2312, 2315, 2316, T.I.A.S. No. 5200; *United States v. Warren,* 578 F.2d at 1065 n. 4; *United States v. Hilton,* 619 F.2d 127, 131 (1st Cir.), *cert. denied,* 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). The Coast Guard's limited administrative inspections on the high seas, conducted without any prior suspicion of wrongdoing, provide a uniquely effective means for policing compliance with safety and documentation regulations, without

---

**8.** The district court emphasized testimony which indicated that "it was possible to assess the watertight integrity of this small vessel by inspecting the non-private engine compartment of the boat." Defendant Thompson testified:
> [I]n the cockpit starboard side of the seat, you could lift up the approximately one foot by three foot fiberglass hatch and then look straight down and inboard there was a two feet by two foot plywood board with two catches, one on either side that you could remove that and gain access to the engine and right underneath the engine room if the boat had more than two gallons of water in it you could see, the water would be right underneath the boat without ever going down inside the cabin of the boat ....

However, there was no evidence establishing that the boarding party was aware that they could have inspected the engine area without entering the cabin. Thompson testified that he never showed Ensign Black where the hatch was. We would not reasonably expect a stranger to the defendants' vessel to know that he could see the engine area by removing two opaque barriers. Furthermore, while the engine area is underneath part of the cabin, it does not coincide with it. Accordingly, had the boarding party first inspected the engine area and found no water problem there, it still would have had to inspect the cabin area to ensure that that part of the boat was not taking on water.

presenting an unreasonable intrusion on the legitimate privacy interests of seafarers. *See generally United States v. Watson,* 678 F.2d at 772–73.

The Coast Guard's entry of the defendants' cabin, therefore, was reasonably necessary for completion of a routine document and safety inspection, and accordingly did not violate the fourth amendment. Almost immediately upon entering the cabin Ensign Black discovered the cargo of marijuana in plain view, which provided probable cause for the subsequent investigatory search of the entire vessel. *United States v. Clark,* 664 F.2d at 1175; *United States v. Jonas,* 639 F.2d at 203; *United States v. Hicks,* 624 F.2d at 33.

The decision of the district court is REVERSED.