**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**German VILLABONA–GARNICA, Jorge
Enrique Munoz, Defendants–
Appellants.**

**No. 93–4494.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 12, 1995.

---

Amanda Maxwell, Coconut Grove, FL and John Bergendahl, Miami, FL, for appellants.

Allyson Fritz, Asst. U.S. Atty., Jeanne M. Mullenhoff, Linda Collins Hertz, and Nina Mandel, Miami, FL, for appellee.

Before KRAVITCH and EDMONDSON, Circuit Judges, and EISELE *, Senior District Judge.

KRAVITCH, Circuit Judge:

Jorge Enrique Munoz and German Villabona–Garnica ("Villabona") appeal their convictions for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846. We conclude that the district court rulings challenged by appellants were either correct or, at most, constitute harmless error; accordingly, we AFFIRM.[1]

## I.

## A.

In late May 1991, a customs agent conducting a routine inspection of a bonded Miami warehouse (containing items not yet admitted into the United States) noticed two electrical transformers awaiting customs clearance. The agent removed the top from one of the transformers and discovered that there was an eight- to twelve-inch shallow space inside. This was unusual, as the transformer normally would be filled with electrical coil. After lifting the transformer with a fork lift, the agent unscrewed the cover of the drain valve on the side of the transformer and removed the drain plug. Contrary to his expectations, however, no oil came out. His suspicions aroused, the agent then inserted a long, thin metal probe through the drain valve; upon removal, the probe tip was covered with cocaine powder. A similar examination of the second transformer also uncovered cocaine secreted inside.

A U.S. Customs/DEA task force then arranged for a controlled delivery of the transformers, returning them to the bonded warehouse to await the claimant. The transformers eventually were picked up by a legitimate delivery company and passed through two intermediate warehouses. While the operation was in progress, the task force agents were informed that the FBI had been independently investigating the transformer drug importation scheme with the aid of Juan Garcia, a confidential informant ("CI").[2] Garcia told the FBI that the transformers would be picked up at the second warehouse by appellants Munoz and Villabona and two other individuals, Fernando Sanchez–Borrero ("Sanchez") and Victor Julio Diaz.[3] At the predicted time, a truck matching Garcia's description arrived at the warehouse. Munoz was driving the truck; Villabona and Sanchez were passengers. Diaz followed in a car.

After the transformers were loaded into the truck, Munoz drove to the residential complex where he and Villabona lived and parked next to their apartment. The surveillance team followed. The four men then milled around the truck's open hood (although they did not appear to be doing any actual repairs), periodically entering and exiting the cargo compartment through the door in the rear of the cabin. After approximately one hour, Villabona emerged from the back of the truck and started handing out closed paint buckets to the others. The four suspects then carried the buckets from the

---

* Honorable Garnett Thomas Eisele, Senior U.S. District Judge for the District of Arkansas, sitting by designation.

1. At the outset, we note that we find no merit either in Villabona's contention that the district court admitted the audiotapes recorded by the confidential informant without adequate authentication or in Munoz's argument that the trial court improperly restricted the scope of his cross-examination of the confidential informant, and we do not discuss these issues further.

2. Garcia was cooperating with the government in return for lenient sentencing treatment in connection with several pending drug charges.

3. The trial of Diaz and Sanchez was severed from that of Munoz and Villabona. The two also were convicted, but are not parties to this appeal.

truck into Munoz's and Villabona's apartment.

An unidentified Latino teenager also was seen briefly speaking to the four men. Whether this individual engaged in any other conduct that could have led the surveillance officers reasonably to believe that he was a fifth coconspirator is disputed by the parties. *See* Part I.B., *infra.*

In any event, after the four suspects left the apartment, they were allowed to drive about one-quarter to one-half mile away from the building before being arrested. Inspection of the cargo area of the truck revealed that both transformers had been opened and the nearly 110 pounds of cocaine had been removed. The agents then went to the apartment and knocked on the door. Nobody answered, and the agents broke in. Inside the empty apartment the agents found seven plastic paint buckets containing wrapped packages of cocaine.

### B.

On August 2, 1991, Munoz and Villabona filed a motion to suppress the fruits of the warrantless search of their apartment. In its August 28 response to that motion, the government conceded that that search constituted a Fourth Amendment violation. Consequently, the sole issue at the first suppression hearing, in January 1992, was Villabona's standing to challenge the search. *See generally Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). After the magistrate judge concluded that Villabona had standing, the government lodged no objections with the district court, and the district judge granted the motion to suppress.

In September 1992, however, in response to Munoz's and Villabona's motion to suppress the fruits of the transformer search, the government moved for reconsideration of the previous order suppressing evidence from the apartment. The sole ground advanced by the government in support of this request was that "in the preparation for trial of Sanchez and Diaz in March of 1992, including the detailed debriefing of all of the surveillance agents, it became clear that the activities and location of the fifth male, who was never identified by name, contributed to the exigent circumstances supporting the search of the apartment."

It is undisputed, however, that in a written report submitted on the day of the arrest, June 22, 1991, Special Agent Robinson, one of the surveillance officers, noted that she saw five males around the truck as it was being unloaded, and that all "[f]ive males unloaded 7 plastic paint containers and other items ... from [the] truck" and walked "in and out" of the vicinity of Munoz's and Villabona's apartment. Two weeks later, another surveillance officer, Senior Special Agent Leon, similarly testified before the grand jury that there was a fifth male on the scene who was "going from the truck to the house and back and forth." The government's reconsideration request, however, neither addressed the reasons for its failure to follow up on this information until March 1992, nor explained why it subsequently waited until September 1992 to file the reconsideration motion.

The magistrate judge found that although the government's initial failure to present the fifth male/exigent circumstances argument was the result of simple negligence rather than strategic delay, reconsideration nevertheless was unwarranted. On the first day of trial, however, the district court declined to follow the magistrate judge's recommendation, granted the reconsideration motion, and conducted a second suppression hearing.

At the second hearing, two surveillance agents testified about the actions of the fifth man. FBI agent Vazquez initially asserted that the fifth man helped the other four carry the cocaine-filled buckets into the apartment, and that that man did not exit the apartment with the others. On cross-examination, however, the agent conceded that, early in the surveillance, the fifth man had walked toward Vazquez's vehicle, and, fearing that the man was engaging in countersurveillance, Vazquez moved to another location, losing sight of the fifth man. Because this retreat took place well before the time that Villabona opened the back of the truck to unload the buckets, Vazquez admitted that he could not have personally observed the fifth man carry anything into the apartment.

Vazquez further noted that after the arrest but before entry into the apartment, the agents attempted to locate the fifth male in the swimming pool area of the complex, but were unable to do so.[4]

Agent Leon also testified that the fifth male carried buckets into the apartment; on cross-examination, however, this agent also admitted that he was not testifying from personal knowledge but was merely relaying other agents' purported observations, overheard on police radio during the surveillance.

In light of this testimony, the district court concluded that because the agents were unable to locate the fifth man and the other four had left the apartment without the cocaine, the officers reasonably could have believed that the fifth man was inside the apartment and that the cocaine was in immediate danger of being destroyed. The court therefore found that there were adequate exigent circumstances to justify warrantless entry into the apartment and denied the motion to suppress.

## II.

Appellants mount a two-pronged challenge to the district court's order suppressing the evidence from the apartment. First, they contend that the district court erred in reconsidering, on the first day of trial, a suppression order issued one year earlier. Second, they contend that, in any event, there were no exigent circumstances justifying the warrantless search, and the trial court therefore erred on the merits of the suppression motion.

## A.

This Circuit has held that when the government moves to reconsider a suppression motion previously granted, it must provide a justification for that motion. *United States v. Thompson,* 710 F.2d 1500, 1504 (11th Cir.1983) ("[B]y failing to raise [an] issue at [a] suppression hearing without offering any justification therefor, the government waive[s] its right to assert it in subsequent proceedings."), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 730, 79 L.Ed.2d 190 (1984).

However, in this case it is unnecessary to consider the government's justification because we find that even if there were error in admitting the evidence from the apartment, such error would be harmless, as the other evidence against the appellants was already overwhelming. *See United States v. Clemons,* 32 F.3d 1504, 1512 (11th Cir.1994) ("Even where an abuse of discretion is shown, ... nonconstitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected."), *cert. denied,* —— U.S. ——, 115 S.Ct. 1801, 131 L.Ed.2d 728 and *cert. denied,* —— U.S. ——, 115 S.Ct. 1801, 131 L.Ed.2d 728 (1995); *United States v. Fortenberry,* 971 F.2d 717 (11th Cir.1992) ("A district court's erroneous admission of evidence does not warrant reversal if the purported error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict."), *cert. denied,* —— U.S. ——, 113 S.Ct. 1020, 122 L.Ed.2d 166 (1993); Fed. R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

Munoz admitted his knowing involvement at trial, arguing that Garcia, the CI, entrapped him into participating in the drug-smuggling venture. Furthermore, Munoz's conversations with the CI, covertly audio-taped by Garcia at the direction of the FBI and introduced into evidence at trial, plainly evidence his willing participation in the transformer scheme. Although Villabona did not testify at trial, the same audiotapes also demonstrate his knowing affiliation with this undertaking. For example, during Munoz's explanation to Garcia of how the transformers would be emptied of cocaine and refilled with other materials to avoid detection by U.S. Customs upon return to Colombia, Villabona is heard suggesting that lead should not be used as a filler. The tapes also reveal Villabona discussing the plans for renting the warehouse to store the transformers, procuring the truck, and reselling the cocaine. Furthermore, Munoz is heard stating that Villabona is one of the few people he could trust in dealing with the cocaine. The audio-

---

4. It is undisputed that the fifth male was dressed in a swimming suit and was holding a towel.

tapes, together with the cocaine found in the transformers and the activity observed during the surveillance, therefore constitute overwhelming evidence of both appellants' guilt, and render any error in reconsidering the suppression motion harmless.

### B.

■ Munoz and Villabona alternatively argue that there were no exigent circumstances justifying the warrantless search of their apartment, and the district court therefore erred in its ruling on the merits of that suppression motion. They concede the existence of probable cause—the question is simply whether a warrant also was required. *See United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir.) (en banc) (warrantless search requires probable cause and exigent circumstances), *cert. denied*, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991).

■ When the existence of exigent circumstances is predicated, as here, on the possibility that evidence will be either destroyed or removed, the appropriate inquiry is whether the facts, as they appeared to the officers at the time of entry, would have led a reasonable, experienced agent to believe such destruction might occur before the warrant could be secured. *Id.* In reviewing the district court's ruling on this issue, we "must construe the facts in the light most favorable to the party prevailing below." *Id.*

Appellants contend that the district court erred in concluding that the agents reasonably believed the fifth male to be a participant in the smuggling scheme, and therefore likely to destroy the cocaine. They point out that both Agent Leon and Agent Vazquez ultimately conceded, at the second suppression hearing, that neither personally saw, or were in a position to see, the fifth male carry anything into the apartment or remain there after the other four men exited. All the suppression hearing testimony establishes, appellants contend, is that the fifth man briefly spoke with the other four, and that the agents looked for him after the arrests— and these events, in appellants' view, simply

evidence the officers' belief at the time that the fifth male was a material witness.

■ "[I]n ruling on the correctness of the trial court's denial of a motion to suppress," however, we "may consider any evidence presented at the trial of the case and [are] not limited to the evidence introduced [at] the hearing on the motion." *United States v. Soto*, 591 F.2d 1091, 1098 n. 5 (5th Cir.) (quoting *United States v. Griffin*, 555 F.2d 1323, 1326 n. 3 (5th Cir.1977)), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 and *cert. denied*, 444 U.S. 845, 100 S.Ct. 89, 62 L.Ed.2d 58 (1979). At trial, Agent Robinson specifically testified that she personally saw all five men carry buckets toward the apartment; this testimony was uncontradicted by the defense. We therefore cannot conclude that the district court clearly erred in its factual finding that the surveillance officers reasonably could have believed that the fifth man was a coconspirator. *See Tobin*, 923 F.2d at 1510 (factual determinations underlying ultimate finding of exigent circumstances reviewed for clear error).

Given this factual conclusion, the district court's legal ruling that exigent circumstances existed also was correct. It is undisputed that the fifth male at one point approached Agent Vazquez's vehicle, forcing him to retreat to another location. If the agents reasonably could have believed that the fifth man was a coconspirator, then they also reasonably could have interpreted this maneuver as countersurveillance (as Vazquez testified). The officers therefore could have believed that the fifth man became aware of the surveillance, warned the other four, and remained in the apartment, after the four departed, to destroy the cocaine. If the fifth male was aware of the surveillance, it does not matter that he could not have been aware of the arrests themselves (because they were not visible from the apartment). The instant case is therefore distinguishable from *United States v. Lynch*, 934 F.2d 1226, 1232–33 (11th Cir.1991) (no exigent circumstances justifying search of defendant's house for cocaine where two suspects were arrested out of

sight of house, arrestees were not expected to return that night, *and persons inside house were unaware of police surveillance* ), *cert. denied,* 502 U.S. 1037, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992), and analogous to *Tobin,* 923 F.2d at 1511 (exigent circumstances present where "the agents could reasonably conclude from the defendants' hurried actions and furtive looks that [they] were either aware or afraid that someone was watching them [and] [d]estruction or removal of ... the narcotics was therefore a possibility").[5]

### III.

■■■ Appellants next challenge the district court's failure to suppress the result of the search of the transformers in the bonded warehouse. The parties agree that this was a "border" search. Border searches are not subject to the probable cause and warrant requirements of the Fourth Amendment; rather, they are simply subject to that amendment's more amorphous reasonableness standard. *See United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977); *United States v. Vega–Barvo,* 729 F.2d 1341, 1344 (11th Cir.), *cert. denied,* 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984). We have "applied this reasonableness requirement by adopting a flexible test which adjusts the strength of suspicion required for a particular search to the intrusiveness of that search." *Vega–Barvo,* 729 F.2d at 1344. In determining the level of intrusiveness of a search, "extensiveness alone does not control." *Id.* at 1345. Rather, it is the "personal indignity suffered by the individual searched [that] controls the level of suspicion required to make the search reasonable." *Id.* at 1346.

■■■ The initial search, which occurred when the customs agent removed the top of the transformer and then the drain plug, required no suspicion of illegality to be justi-

fied. *See United States v. Hill,* 939 F.2d 934, 936 (11th Cir.1991). Under *Vega–Barvo,* the subsequent search, which occurred when the agent inserted the probe into the transformers, required only a small quantum of suspicion to be reasonable, as such an intrusion was unlikely to evoke a great sense of personal indignity. By the time the customs inspector inserted the probe, he already knew that no oil had come out of the drain valve and that the top of the transformer had an inexplicable hollow compartment. In light of this knowledge, he possessed, at a minimum, a reasonable suspicion that something was amiss.

■■■ Appellants stress that the *extent* of the search here was unreasonable because insertion of the probe could have inflicted costly damage if the transformers had been genuine. We repeatedly have approved similarly destructive border searches of property, however, when the customs agents possessed a comparable degree of suspicion. *See United States v. Puig,* 810 F.2d 1085, 1086–87 (11th Cir.1987) (where customs officer had reasonable suspicion that contraband was in inaccessible compartment of boat, drilling small hole in plywood section of hull was reasonable); *United States v. Moreno,* 778 F.2d 719, 720–21 (11th Cir.1985) (drilling holes in fuel tanks of boat was reasonable where boat was on suspected smuggler list, had unusually large fuel tanks, and, after drilling commenced, newly-arriving customs agent recalled from previous boarding that boat had secret compartments); *United States v. Sarda–Villa,* 760 F.2d 1232, 1237–39 (11th Cir.1985) (in view of customs officer's reasonable suspicion due to defendant's obviously false story about port of origin, use of ax and crowbar to pry open layers of boat deck was reasonable) (alternative holding). The motion to suppress the fruits of the transformer search was therefore properly denied.

---

5. Of course, in light of the overwhelming evidence against appellants, *see* Part II.A., *supra,* even if the district court had erred in finding exigent circumstances, failure to suppress the evidence from the apartment would, in any event, likely be harmless beyond a reasonable doubt. *See Lynch,* 934 F.2d at 1233–34 (erroneous finding of exigent circumstances nevertheless harmless beyond a reasonable doubt); *see also Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

IV.

During the government's cross-examination of Munoz, the prosecutor inquired whether he had had an opportunity to review, over the last "year or two," the audiotapes recorded by the CI. Munoz said no, and then launched into a two to three minute monologue detailing the difficulties he and Villabona had had in obtaining the tapes, and equipment to play them on, at the various prisons where the two had resided while in pretrial detention. Villabona contends that the district court erred in not granting a mistrial after Munoz's reference to their joint year and one-half pretrial incarceration, as Villabona's presumption of innocence was impermissibly compromised by that comment. *See Estelle v. Williams,* 425 U.S. 501, 503–05, 96 S.Ct. 1691, 1692–93, 48 L.Ed.2d 126 (1976) (presumption of innocence may be impaired, and due process right to fair trial violated, where accused is compelled to attend trial while dressed in clearly identifiable prison clothing); *United States v. Harris,* 703 F.2d 508, 509–11 (11th Cir.1983) (due process violated where defendant was compelled to dress in prison clothing during jury voir dire).[6]

It is, of course, of no import that the fact of Villabona's incarceration was made known to the jury directly rather than, as in *Estelle,* inferentially. *Estelle,* however, is distinguishable for another reason. In that case, the Supreme Court emphasized that the prison clothing was a "constant reminder of the accused's condition," "a continuing influence throughout the trial" that presented an "unacceptable risk" of "impermissible factors coming into play" and corrupting a juror's judgment. 425 U.S. at 504–05, 96 S.Ct. at 1693. Here, by contrast, Munoz's comment was quite brief. We previously have noted that "the mere utterance of the word [jail, prison, or arrest] does not, without regard to context or circumstances, constitute reversible error per se." *United States v. Veteto,*

701 F.2d 136, 139–40 (11th Cir.) (quoting *United States v. Barcenas,* 498 F.2d 1110, 1113 (5th Cir.), *cert. denied,* 419 U.S. 1036, 95 S.Ct. 521, 42 L.Ed.2d 312 (1974)), *cert. denied,* 463 U.S. 1212, 103 S.Ct. 3548, 77 L.Ed.2d 1396 and *cert. denied,* 464 U.S. 839, 104 S.Ct. 131, 78 L.Ed.2d 127 (1983). When viewed in context, Munoz's remarks were, in our view, unlikely to prejudice the jury sufficiently to rise to the level of a due process violation. *See United States v. Beasley,* 2 F.3d 1551, 1559 (11th Cir.1993) (witness noted that he met defendant in prison in 1970's in response to defendant's counsel's question about length of their acquaintance; mistrial properly denied because, *inter alia,* reference to prison was made in passing and added nothing to government's case), *cert. denied,* —— U.S. ——, 114 S.Ct. 2751, 129 L.Ed.2d 869 (1994); *Veteto,* 701 F.2d at 139–40 (witness, in response to government's inquiry as to why defendant wanted a machine gun, volunteered that defendant had been in prison before; answer was brief, unelicited, and unresponsive, added nothing to government's case, and denial of mistrial was accordingly proper).

V.

For the foregoing reasons, the convictions of both Munoz and Villabona are AFFIRMED.

---

6.  *See also Harris,* 703 F.2d at 510 (two dangers to presumption of innocence flowing from the jury's knowledge of the defendant's incarceration: (i) it brands the defendant "in the eyes of the jurors with an unmistakable mark of guilt" and (ii) *pre*-trial incarceration, in particular, while often the result of nothing more than an inability to raise bail, may lead the jury to speculate that the defendant is particularly dangerous) (quoting *Estelle v. Williams,* 425 U.S. 501, 518–19, 96 S.Ct. 1691, 1700, 48 L.Ed.2d 126 (1976) (Brennan, J., dissenting)).