[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13730
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cr-00046-MP-GRJ-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KENNETH CHRISTIAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(June 17, 2015)

Before TJOFLAT, WILSON, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Kenneth Christian appeals his convictions for armed bank robbery, possessing and brandishing a firearm during a crime of violence, and being a felon in possession of a firearm.  Christian challenges his convictions on two grounds. First, he contends that plain error occurred because the prosecutor commented on Christian's pre-trial incarceration and suggested that he belonged in custody because he was dangerous.  Second, he argues that the district court abused its discretion in limiting his cross-examination concerning a cooperating co-defendant's bias.  After review of the record and consideration of the parties' briefs, we affirm.

## I.

Just before noon on March 28, 2012, a PNC Bank in Gainesville, Florida, was robbed.  Surveillance photos showed the robber, later determined to be Christian, being dropped off by a white Chevrolet Tahoe.  Dressed all in black except for white gloves, Christian entered the bank with a gun in his right hand and a ski mask over his face.  Christian pointed a gun at one of the bank managers, threw a bag at him, and told him to fill it with money.  The manager took the bag to one of the tellers, who filled the bag with just over $2,000 and a dye pack. Christian grabbed the bag and fled the bank.  The dye pack exploded as Christian ran to the same white Tahoe.  During the course of the robbery, Christian twice threatened to shoot the manager if bank employees did not hurry up.

A day or two after the robbery, Christian called an acquaintance, Joseph Riley, to ask if he could stop by and request a favor. Christian and his girlfriend, Dania Ifill, went to Riley's residence. While there, Christian told Riley he needed a place to hide out for a couple of days. He eventually admitted to both Ifill and Riley that he had robbed the PNC Bank. Ifill then left. Riley and his wife allowed Christian to stay one night in their house. Out of fear, they did not call the police, although Riley later told his employer what Christian had said. Christian left early the next morning. At some point thereafter, Christian fled to the United States Virgin Islands.

In investigating the robbery, police searched records of white Chevrolet Tahoes in the central Florida area. One of the vehicles belonged to the stepfather of Kentrell Houston. Houston was pulled over in the Tahoe several times by police following the robbery, but he denied involvement. During one of these stops, police searched the Tahoe with Houston's consent and found white gloves in the back portion of the vehicle. In a later interview with police, Houston eventually admitted to being the getaway driver for the robbery.

Christian was arrested in the Virgin Islands and transported to the Alachua County Jail in Gainesville. He asked to speak with federal officials because he wanted the case to be prosecuted federally. On September 7, 2012, two detectives and a federal agent jointly interviewed Christian. During the recorded interview at

3

the jail, Christian confessed that he had committed the bank robbery. He also provided details about the robbery, including that he had used a .40-caliber pistol.

Christian and Houston were indicted in November 2012. Christian was charged with one count each of armed bank robbery, in violation of 18 U.S.C. §§ 2113(a), 2113(d), and 2, possessing and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and 2, and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Christian proceeded to trial. Houston pled guilty and testified for the government at trial.

A jury found Christian guilty of all three counts. The district court adjudicated Christian guilty and sentenced him to a total term of 346 months of imprisonment. Christian now appeals.

## II.

Christian argues for the first time on appeal that the prosecutor, when questioning Ifill during the trial, suggested that Christian belonged in custody because he was dangerous. According to Christian, this exchange, when viewed in context of a pattern of references to his incarceration throughout the trial, impaired his presumption of innocence.

Where no objection is made at trial, we review for plain error whether comments about a defendant's incarceration deprived him of a fair trial in violation

of due process.  *See United States v. Barcenas*, 498 F.2d 1110, 1113 (5th Cir. 1974).[1]  To establish plain error, a defendant must show (1) error, (2) that is plain, and (3) that affects substantial rights.  *United States v. Evans*, 478 F.3d 1332, 1338 (11th Cir. 2007).  If all three conditions are met, we may exercise our discretion to recognize the error, but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *Id.*

The Supreme Court has held that the presumption of innocence may be impaired, and the due-process right to a fair trial violated, where the accused is compelled to stand trial while dressed in clearly identifiable prison clothing. *Estelle v. Williams*, 425 U.S. 501, 503-05, 96 S. Ct. 1691, 1692-93 (1976); *see also United States v. Harris*, 703 F.2d 508, 509-12 (11th Cir. 1983) (holding that due process was violated where the defendant was compelled to dress in prison clothing during jury voir dire).  The Court explained that prison clothing is a "constant reminder of the accused's condition" that is likely to be a "continuing influence throughout the trial," presenting an unacceptable risk of "impermissible factors coming into play" and corrupting a juror's judgment.  *Estelle*, 425 U.S. at 504-05, 96 S. Ct. at 1693.  For example, we have noted that a jury's knowledge of a defendant's pre-trial incarceration "may lead the jury to speculate that the

---

[1]  This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

5

defendant is particularly dangerous." *United States v. Villabona-Garnica*, 63 F.3d 1051, 1058 n.6 (11th Cir. 1995) (citing *Harris*, 703 F.2d at 510)).

Likewise, we have recognized that comments about a defendant's incarceration also can impair the presumption of innocence. *See, e.g.*, *id.* at 1058. Comments about a defendant's incarceration do not, however, constitute reversible error *per se*. *Id.* Rather, we consider the context and circumstances to determine whether the comments prejudiced the defendant's right to a fair trial. *See id.* (collecting cases); *see also United States v. Flores*, 572 F.3d 1254, 1262 (11th Cir. 2009); *United States v. Emmanuel*, 565 F.3d 1324, 1335 (11th Cir. 2009) ("[W]here the comment is brief, unelicited, and unresponsive, adding nothing to the government's case, the denial of a mistrial is proper.").

During direct examination of Ifill as part of the government's case-in-chief, the prosecutor asked, "Are you concerned for your safety?" Ifill responded, "A little." The government replied, "Do you know he's in custody, though?" Ifill responded, "Yes, I know." Christian contends that the prosecutor's comments improperly suggest that Christian should be incarcerated because he was dangerous and posed a threat to Ifill.

The prosecutor's question to Ifill about Christian being in custody was improper. In contrast to *Barcenas* and *Villabona-Garnica*, for example, the reference to pre-trial custody did not come from a witness's non-responsive answer

but instead came directly from the prosecutor. *See Villabona-Garnica*, 63 F.3d at 1058; *Barcenas*, 498 F.3d at 1113-14.   Although Christian acknowledges in his reply brief that his dangerousness "was germane to the case," the reference to Christian's pre-trial custody should have been avoided.

Nonetheless, we cannot conclude that Christian has shown "that the remark[s] so influenced the trial's outcome or affected his rights as to constitute plain error." *United States v. Veteto*, 701 F.2d 136, 140 (11th Cir. 1983).   Viewing the remarks in context, we believe that any prejudice resulting from the prosecutor's questioning did not substantially affect the fairness of the trial.   *See United States v. Young*, 470 U.S. 1, 20, 105 S. Ct. 1038, 1048-49 (1985) (holding that a prosecutor's improper remarks did not rise to the level of a plainly erroneous due-process violation because they did not "undermine the fairness of the trial and contribute to a miscarriage of justice error").

First, the government introduced extensive evidence, unchallenged by Christian both below and on appeal, establishing Christian's dangerousness even before the prosecutor's improper comments.   Ifill herself testified that she was threatened several times by Christian, including that Christian was "going to make [Ifill's] life a living hell."   Given that the reference to Christian's pre-trial incarceration immediately followed this discussion of Christian's threats, the prosecutor's comments did not inject into the trial any implication of

dangerousness that was not already present to a significant extent.  Other evidence before the improper comments similarly supports that Christian was dangerous.  Riley and his wife both testified that they were fearful of Christian.  And both Ifill and Riley testified that Christian admitted committing the armed bank robbery, which, according to the bank employees' earlier testimony, involved threats of shooting innocent employees.

Second, other references to Christian's pre-trial incarceration were made for the purpose of establishing a foundation and context for the admission of Christian's confession at the county jail.[2]  As such, these later references to jail and Christian's pre-trial incarceration were relevant to issues properly before the jury at trial.  *See Barcenas*, 498 F.2d at 1113 (stating that references to "jail," "prison," and similar terms are "to be avoided, *where irrelevant*") (emphasis added).  And since they independently established Christian's in-custody status, the prosecutor's comments to Ifill added nothing that was not already admissible.

Third, and finally, the evidence overwhelmingly established Christian's guilt of the bank robbery.  *Cf. Harris*, 703 F.2d at 513 ("[I]f the evidence of guilt is overwhelming, then the constitutional error occasioned by the defendant's appearance in a prison uniform is harmless under [*Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967).  Both Ifill and Riley testified that Christian told

---

[2] Christian does not argue that the confession was involuntary.

8

them that he had robbed the bank.  Houston testified that he was the getaway driver for Christian when Christian robbed the bank.   And in Christian's confession, played before the jury at trial, Christian admitted that he robbed the bank, and he provided details about the bank robbery that were consistent with the other evidence in the case.  In addition, Ifill testified that she found dye-stained money in their washing machine, after being told by Christian not to look inside, and Christian's brother's wife testified that she received a bag from Ifill after the robbery containing Christian's clothing and a .40-caliber pistol, which was the type of gun used in the robbery.

Consequently, even if the prosecutor's remarks were improper, Christian has not shown that the remarks so influenced the trial's outcome or affected his right to a fair trial as to constitute plain error.  *See Veteto*, 701 F.2d at 140.

## III.

Christian next argues that his inability to question Houston about other crimes violated his right to cross-examination under the Sixth Amendment because he was unable to explore part of the benefits that Houston received from testifying.

We review a district court's decision limiting cross-examination for abuse of discretion.  *United States v. Orisnord*, 483 F.3d 1169, 1178 (11th Cir. 2007).  Nonetheless, the district court's discretion in limiting the scope of cross-

examination is subject to the requirements of the Sixth Amendment. *United States v. Williams*, 526 F.3d 1312, 1319 (11th Cir. 2008).

The Confrontation Clause of the Sixth Amendment "guarantees criminal defendants an opportunity to impeach through cross-examination the testimony of witnesses for the prosecution." *United States v. Baptista*-Rodriguez, 17 F.3d 1354, 1370 (11th Cir. 1994). "The importance of full cross-examination increases where the witness is the star government witness or participated in the crimes for which the defendant is being prosecuted." *Williams*, 526 F.3d at 1319. Also, "where a prosecution witness has been threatened with a criminal charge or actually charged with a criminal offense, the defendant is entitled to explore those circumstances on cross-examination in order to bring to the jury's attention the witness' possible motive or self-interest with respect to the testimony given." *United States v. Garrett*, 727 F.2d 1003, 1011 (11th Cir. 1984), superseded by statute on other grounds, *United States v. Elgersma*, 929 F.2d 1538, 1544-45 (11th Cir. 1984).

But not all limitations on otherwise permissible cross-examination violate the Confrontation Clause. *Baptista-Rodriguez*, 17 F.3d at 1370. Trial judges may impose reasonable limits on otherwise permissible cross-examination based on various concerns, including confusion of the issues or interrogation that is repetitive or only marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986). "The test for the Confrontation Clause is

whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *United States v. Garcia*, 13 F.3d 1464, 1469 (11th Cir. 1994).

At trial, Houston testified that he had pled guilty to bank robbery and to aiding and abetting in the possession of a firearm, and that he was cooperating with the government in hopes of receiving a reduced sentence. Houston further explained that, on May 31, 2012, a detective asked Houston to come to the police station to speak with him about "something else." At some point the discussion turned to the bank robbery and, after initially lying about his involvement, Houston eventually confessed to knowing about and participating in the robbery.

On cross-examination, defense counsel asked Houston if he had ever been charged with the crime—the "something else"—that the detective originally wanted to talk to him about. The government objected. During a sidebar conference, the following exchange took place:

| [Prosecutor]: | My concern is [defense counsel] has been asking him have you ever been charged with a crime. That's not proper impeachment – but to say he has been charged because he has one prior charge and I have a copy of the *nolle prosequi*. |
| --- | --- |
| [Defense Counsel]: | That's precisely what I want to ask him. |
| [The Court]: | It is your contention that that's part of a plea bargain? |

11

[Defense Counsel]:    That's my contention.  He didn't get charged with a shooting incident involved with a firearm that's not involved in the case.

While the transcript does not reflect a ruling by the court, the parties agree that the court sustained the government's objection.  Defense counsel then cross-examined Houston about his possession of another firearm and proceeded to question Houston about how he hoped to benefit from testifying against Christian. In response to defense counsel's questions, Houston responded that he had to earn any benefit he would receive from the government, and that one of the ways to do so was to testify that Christian was the robber.

Under the circumstances, we cannot say that a reasonable jury would have received a significantly different impression of Houston's credibility had the court allowed the proposed line of questioning to continue.  *See Garcia*, 13 F.3d at 1469. While the importance of cross-examining Houston was heightened because he was involved in the robbery at issue and was potentially threatened with some unspecified other criminal charge, Houston's motives for testifying and potential biases were sufficiently explored during cross-examination.  Houston testified that he was a bank robber, that he had repeatedly lied to police, that he had pled guilty to this robbery, that he faced up to life imprisonment, that he had testified with the hope of receiving a more lenient sentence, and that one of the ways for him to earn a lesser sentence was to say that Christian was involved in the robbery.  Other than

12

the "something else," Christian's cross-examination of Houston was not limited by the court. Taken together, the jury was presented with substantial evidence to draw a fair inference about Houston's credibility and his motives for testifying.

Christian suggests that the "something else" was so significant that, when confronted with it, Houston changed his tune and admitted to his involvement with the bank robbery. We disagree with that characterization of Houston's testimony. Although Houston was at the police station to talk about "something else," his testimony reflects that he changed his story after the discussion had already turned to the bank robbery. He testified that he initially lied and said that he was unaware that Christian planned to commit a bank robbery and that he was innocently driving him to see a girl, but when pressed about his explanation, he told the police the truth.

Overall, the jury would not have received a significantly different impression of Houston's credibility had the court allowed the proposed line of questioning to continue. Therefore, the Confrontation Clause was satisfied, and the district court did not abuse its discretion in limiting cross-examination.

**AFFIRMED.**

13