[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-12235
_____

D.C. Docket No. 0:11-cr-60221-WJZ-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ROBERT JOSEPH VALERIO,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 20, 2013)

Before BARKETT and MARCUS, Circuit Judges, and CONWAY,[*] District Judge.

BARKETT, Circuit Judge:

Robert Joseph Valerio appeals the district court's denial of his motion to

suppress evidence that led to his arrest for growing marijuana.  Following the

_____

[*]Honorable Anne C. Conway, Chief Judge, United States District Court for the Middle
District of Florida, sitting by designation.

denial of his motion to suppress, Mr. Valerio was convicted after a bench trial of growing more than 100 marijuana plants in a Deerfield Beach warehouse, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(2).  The central issue presented in this appeal is whether Terry v. Ohio, 392 U.S. 1 (1968), authorized law enforcement officers to effectuate an investigative seizure of Mr. Valerio nearly one week after last observing him do anything suspicious.  Because the constitutional authority to make a Terry stop is dependent upon the exigencies associated with "on-the-spot observations of the officer on the beat[,]" id. at 20, we conclude that the officers' seizure here was not authorized by the Fourth Amendment. We therefore hold that the district court erred in denying his motion to suppress the evidence against Mr. Valerio and vacate his conviction.

## I.    Background

Mr. Valerio became the target of an investigation of the Drug Enforcement Administration (DEA) on July 27, 2011, after he visited Green Touch Hydroponics ("Green Touch"), a retail store selling hydroponic gardening equipment.  Special Agent David Lee Hibbs of the DEA was conducting surveillance at Green Touch under the view that people who purchased hydroponic equipment were likely to be involved in growing marijuana.  While conducting surveillance, Agent Hibbs saw a black Chevrolet truck enter the parking lot in the back of the store.  He noticed that the truck had no license plate and that it backed into a parking space, which he

2

surmised was an attempt to conceal the truck's missing license plate. Agent Hibbs watched the driver, later confirmed to be Mr. Valerio, walk into the store and return about fifteen to twenty minutes later with a white plastic shopping bag.

Agent Hibbs followed Mr. Valerio as he drove out of the parking lot and noted that Mr. Valerio kept looking at his rearview mirror, which Agent Hibbs interpreted as nervousness at the prospect of being followed by law enforcement. Eventually, Mr. Valerio pulled over to the side of the road and walked towards the rear of the vehicle holding what appeared to Agent Hibbs to be a license plate. As Agent Hibbs was traveling past Mr. Valerio's truck, he could not see what Mr. Valerio did with the object in his hands.

Agent Hibbs next encountered Mr. Valerio approximately two weeks later on August 17, when he was again conducting surveillance at Green Touch. He observed Mr. Valerio drive the same black truck into the parking lot without a license plate, back into a spot, and enter the store. Mr. Valerio left the store after about twenty minutes and drove away but shortly thereafter stopped at a 7-11 parking lot. Another investigating agent observed that the truck had a license plate affixed to it when it left the 7-11 parking lot. The DEA agents followed Mr. Valerio to a warehouse in Deerfield Beach, which the agents thought was suitable for a marijuana grow operation. Once there, the agents saw Mr. Valerio park near

bay 15 of the warehouse and walk toward the warehouse building but did not see where he went or witness anything else of note.

The next night, August 18, DEA agents conducted surveillance of the area around bay 15 of the warehouse and observed lights emanating from a door in the area of bay 15, though they could not be sure which specific door. Nearly a week later on August 24, the Broward County Sheriff's Office brought a K-9 to the warehouse to sniff for drugs. The K-9 sniffed all of the doors on the side of the warehouse where bay 15 was located but only alerted to bay 14. Based on this information, investigating agents obtained a search warrant for bay 14, which they served that same day. Rather than corroborating their previous suspicions of Mr. Valerio, their search failed to uncover any new evidence that Mr. Valerio was running a marijuana grow operation out of one of the bays. They discovered that both bay 14 and the adjoining bay 13 were owned by Jeremy Staska, who operated a recording studio there.[1] Mr. Staska told the investigating officers that bands regularly recorded in the studio until late at night, which explained the lights coming from underneath the bay door on the night of August 18. He also estimated that a third of the bands that used his studio smoked marijuana while recording. When shown a picture of Mr. Valerio, Mr. Staska told the officers that

---

[1] Mr. Staska also told the officers that his bay was not in any way connected to bay 15.

Mr. Valerio was friends with a mechanic who worked at the warehouse and that it was possible that he rented a bay on the other side of the warehouse.

After failing to find any evidence that Mr. Valerio was involved in a marijuana grow operation from the search of bays 13 and 14 and the K-9's failure to alert to the presence of drugs in bay 15, Broward County Sherriff's Office Detective Scott Ambrose directed DEA Special Agent Joseph Ahearn and Detective Joseph Lopez to go to Mr. Valerio's home to attempt a "voluntary citizen encounter," in hopes of obtaining useful evidence based on Mr. Valerio's cooperation. The agents drove to Mr. Valerio's home but did not knock on his door and ask to speak with him, as instructed. Instead, they waited across the street until he emerged from his house and entered his truck, which was parked in his driveway. At that point, the officers blocked his exit from the driveway with their vehicle and Agent Ahearn got out of his vehicle and approached Mr. Valerio, with his gun drawn and pointed in the direction of Mr. Valerio, ordering him in a loud voice to get out of his truck. Agent Ahearn was dressed in street clothes but had on a bulletproof vest, with a black placard reading "Police" over his clothes. When Mr. Valerio stepped out of his truck, Agent Ahearn holstered his gun and immediately conducted a full-body pat-down search of Mr. Valerio's person and escorted him to the front of his truck. Detective Lopez then asked Mr. Valerio if he operated any warehouses in the area. Mr. Valerio initially stated that he did not.

5

But following further questioning, Mr. Valerio admitted to growing marijuana inside bays 15 and 16 at the Deerfield Beach warehouse.

## II.    Discussion

We start by noting that the government concedes this was not a voluntary encounter and the parties agree that, at minimum, the officers' encounter with Mr. Valerio in his driveway constituted a seizure subject to Fourth Amendment scrutiny.[2]  The question, then, is whether the officers' stop-and-frisk of Mr. Valerio, one week after they had last observed him engage in any suspicious activity, was constitutional under the Fourth Amendment principles articulated in Terry.[3]

The Fourth Amendment provides that "[t]he right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]"  U.S. Const. Amend. IV.  Before Terry, the Supreme Court interpreted the Fourth Amendment to require police officers to have probable cause or a warrant to justify any seizure of an individual. Dunaway v. New York, 442 U.S. 200, 207-08 (1979).  But in Terry, the Court held

---

[2] Mr. Valerio argues that his encounter with the officers in his driveway constituted a de facto arrest, while the government argues that it was nothing more than a Terry stop.  Because we conclude that the officers' seizure of Mr. Valerio was unconstitutional even if it did not amount to a formal arrest, we need not address this claim.

[3] "Whether the district court erred in denying the motion to suppress is a mixed question of law and fact.  We review the district court's factual findings under the clearly erroneous standard; we review de novo its application of the law to those facts."  United States v. McKinnon, 985 F.2d 525, 527 (11th Cir. 1993) (internal citations omitted).

6

for the first time that not all seizures must be supported by probable cause to comport with the Fourth Amendment.  Specifically, the Court recognized that there was "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and <u>as a practical matter could not be</u>, subjected to the warrant procedure." <u>Terry</u>, 392 U.S. at 20 (emphasis added).  In that limited context, the Court carved out an exception to the Fourth Amendment's default rule that all seizures must be supported by probable cause and held that officers could "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (citing <u>Terry</u>, 392 U.S. at 30).

The investigative stop contemplated by <u>Terry</u> is not a policing tool that can be constitutionally deployed in any context in which law enforcement has reasonable suspicion that an individual is involved in criminal activity.  Rather, it may be used only within the "rubric of police conduct" addressed in <u>Terry</u>, for which the timing and circumstances surrounding the investigative stop matter.  The exception established in <u>Terry</u> to the general Fourth Amendment requirement that all seizures be supported by probable cause is justified by the exigencies associated with law enforcement "dealing with . . . rapidly unfolding and often dangerous situations on city streets . . . ."  <u>Terry</u>, 392 U.S. at 10.  <u>Terry</u> stops are thus limited

7

to situations where officers are required to take "swift action predicated upon the on-the-spot observations of the officer on the beat[.]"[4] Id. at 20. Indeed, the Court in Terry emphasized that in creating a narrow exception to the probable cause requirement, it did not "retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure or that in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances." Id. (emphasis added and internal citations omitted). In other words, the police may not use Terry as an end-run around the warrant requirement in the context of a standard, on-going police investigation.

The timing of and circumstances surrounding the officers' seizure of Mr. Valerio in this case places it well outside of the Terry exception to the probable cause requirement. The stop here was not responsive to the development of suspicion within a dynamic or urgent law enforcement environment. Rather, the officers went to Mr. Valerio's home nearly a week after they had last observed him do anything. Given this delay and the complete absence of any contemporaneous observations of Mr. Valerio that would necessitate "swift" law enforcement action,

---

[4] The need for swift action may be the imminence of the commission of a crime or, as in United States v. Hensley, 469 U.S. 221 (1985), an on-the-beat recognition of an armed and dangerous suspect of a past completed crime. Id. at 234 ("A brief stop and detention at the earliest opportunity after the suspicion arose is fully consistent with the principles of the Fourth Amendment." (emphasis added)).

8

we cannot say that the underlying purposes behind <u>Terry</u>'s exception to the probable cause requirement were in any way present when the officers seized Mr. Valerio. The opportunity to <u>Terry</u> stop a suspect, a law enforcement power justified by and limited to the exigent circumstances of the moment, cannot be put in the bank and saved for use on a rainy day, long after any claimed exigency has expired.  Thus, the seizure of Mr. Valerio did not qualify for the <u>Terry</u> exception to the Fourth Amendment's probable cause rule. Instead, the passage of time between Mr. Valerio's suspicious activity and the officers' seizure of him made it entirely practicable for law enforcement officers to proceed with their investigation in a manner consistent with the default requirements of the Fourth Amendment, which only allow for a seizure upon a warrant or probable cause accompanied by well-defined exigent circumstances.[5] <u>Id.</u>  Moreover, no exigency emerged from the simple observation that Mr. Valerio had exited his house and entered his truck. As the government does not contend that its officers had probable cause that Mr. Valerio was involved in criminal activity at the time they seized him, the seizure of Mr. Valerio was unconstitutional under the circumstances discussed above.

---

[5] In this case, investigating officers were free to continue to conduct surveillance of the warehouse or Mr. Valerio's residence, attempt to verify through business or utility records that Mr. Valerio was a tenant at the warehouse, or even initiate a genuinely voluntary encounter with Mr. Valerio, which does not invoke Fourth Amendment concern.  <u>United States v. Drayton</u>, 536 U.S. 194, 200 (2002).

Accordingly, Mr. Valerio was subjected to an unconstitutional seizure, we

REVERSE the district court's denial of his motion to suppress, VACATE his

conviction, and REMAND for further proceedings consistent with this opinion.[6]

---

[6] Evidence obtained as a result of an illegal seizure is suppressible as fruit of the poisonous tree.  See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).  It is possible for the government to avoid suppression of evidence discovered subsequent to an illegal search or seizure by showing that the evidence was obtained through voluntary consent and that taint of the Fourth Amendment violation has been sufficiently purged.  United States v. Santa, 236 F.3d 662, 676-77 (11th Cir. 2000).  However, the government failed to make this argument below and it is therefore waived before this Court.  United States v. Thompson, 710 F.2d 1500, 1504 (11th Cir. 1983) ("[B]y failing to raise the issue at the suppression hearing without offering any justification therefor, the government waived its right to assert it in subsequent proceedings.").