[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15926
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cr-20498-DMM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHAWN DELLENA SAMUEL,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 26, 2014)

Before WILSON, ROSENBAUM, and FAY, Circuit Judges.

PER CURIAM:

Shawn Dellena Samuel appeals his conviction and 15-year sentence for

possession of a firearm and ammunition by a convicted felon.  We affirm.

## I. BACKGROUND

On June 26, 2013, Sergeant ("Sgt.") Emanuel Prospere and Detective Roderick Passmore of the Miami Police Department were investigating the homicide of Duane Luscant, who had been killed on June 11.  Luscant had been shot several times, and the murder weapon had not been recovered.  Law enforcement had identified several suspects, including Samuel, because officers had obtained information that Luscant had received threatening text messages from Samuel concerning a narcotics transaction.  The text messages stated Samuel "was going to do something to the victim."  ROA at 177.  Unidentified witnesses also had identified Samuel as having been involved in the Luscant homicide.

Sgt. Prospere had known Samuel for approximately nine years, and he and Samuel "have a history."  ROA at 177.  As a result of the investigation, Sgt. Prospere wanted to question Samuel about the homicide.  At approximately 8:00 p.m. on June 26, 2013, Sgt. Prospere and Detective Passmore saw Samuel riding a bicycle.  When he first saw Samuel on June 26, Sgt. Prospere was driving an unmarked car, traveling eastbound.  Samuel was approximately 20 feet away, traveling westbound, and did not change direction.

As Samuel approached the officers, Detective Passmore told Sgt. Prospere: "[B]e careful, I noticed a bulge."  ROA at 179.  Sgt. Prospere exited his car and told Samuel he wanted to speak with him.  Neither officer drew his weapon when

2

exiting the car. Samuel dismounted his bicycle, and Sgt. Prospere "grabbed him by the rear of the shirt," to ensure the officers' safety and to prevent Samuel from running. ROA at 179. When Sgt. Prospere ordered Samuel to place his hands on the squad car, Samuel told Sgt. Prospere he had a gun in his pocket. Sgt. Prospere saw the gun and requested assistance over the radio. Another officer arrived and removed a loaded gun from Samuel's pocket. Neither Sgt. Prospere nor Detective Passmore asked Samuel any questions before he mentioned the gun.

The gun was loaded. The gun was a 9mm semi-automatic Ruger that had been manufactured in Arizona and had traveled in interstate commerce. Samuel had three prior Florida convictions for possessing cocaine with the intent to deliver, in violation of Fla. Stat. § 893.13(1)(a)(1).

A federal grand jury indicted Samuel for possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Samuel moved to suppress a gun and ammunition seized from him during the June 26, 2013, traffic stop and any statements attributed to him on that date.

Sgt. Prospere testified to the above facts and testified Samuel was both a person of interest and a suspect in the homicide investigation. When asked to identify the source of the information regarding the text messages, Sgt. Prospere responded the investigation was still open, and the government stated it "wouldn't want to put any of the witnesses in jeopardy." ROA at 182. Sgt. Prospere testified

3

the information about the threatening messages had been received on June 12, the day after the homicide.  Various individuals also had identified Samuel on June 26.

Samuel called Detective Passmore, who testified he had been involved in the investigation into the Luscant homicide.  During that investigation, he and Sgt. Prospere interviewed Michael Miller, whom officers had arrested for aggravated assault with a firearm.  Miller said he was an associate of Samuel and told the officers where Samuel could be found.  On the day the officers stopped Samuel, Detective Passmore had been in the passenger's seat of the car, when Samuel approached them on the driver's side.  As the officers and Samuel approached each other, Detective Passmore warned Sgt. Prospere about a bulge in Samuel's waistband.  Based on his experience, Detective Passmore believed the bulge, which was on the front right side of Samuel's pants, was a gun.  Detective Passmore further testified, if he had not seen a bulge on Samuel, he still would have stopped Samuel to speak with him about the homicide.  After finding the gun, the officers decided to take Samuel to the station for further questioning, instead of discussing the homicide on the street.

During cross-examination by the government, Detective Passmore testified Michael Miller did not tell officers Samuel was involved in the homicide.  On June 26, Miller told officers Samuel was part of a group of people with whom the

homicide victim "supposedly had some issues" related to money.  ROA at 209.

Other witnesses previously had identified Samuel as a suspect in the homicide.

The district judge denied Samuel's motion to suppress.  The judge found the officers' testimony to be credible, and concluded a *Terry*[1] stop was justified.  The judge explained the officers had reasonable suspicion to briefly stop Samuel to speak with him about their investigation, and that suspicion was "heightened," when they saw the bulge.  ROA at 221.  The judge further explained both the information implicating Samuel in the homicide and the bulge in his pocket were valid and independent reasons to conduct a *Terry* stop.

The next month, Samuel signed a plea agreement.  He agreed to enter a conditional plea to the charged count but reserved his right to appeal the denial of his suppression motion.  Samuel also signed a factual proffer, and he acknowledged he had three prior Florida felony convictions for possession with intent to deliver cocaine.

Samuel's presentence investigation report ("PSI") reported several prior Florida controlled-substance convictions, including possession with intent to sell cocaine in April 2007, and in two separate cases in July 2011.  The probation officer calculated an initial base offense level of 24, under U.S.S.G. § 2K2.1(a)(2), because Samuel had at least two prior felony controlled-substance-offense

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

convictions. The probation officer, however, also determined Samuel was an armed career criminal, who was subject to an offense level of 33, under U.S.S.G. § 4B1.4(b)(3)(B). The PSI awarded a 3-level, acceptance-of-responsibility reduction, under U.S.S.G. § 3E1.1, which yielded a total offense level of 30.

The probation officer calculated a criminal-history score of 6 and a criminal history category of III, based on Samuel's prior controlled-substance convictions. Under § 4B1.4(c)(3), Samuel was subject to a criminal history category of IV, as an armed career criminal. Based on a total offense level of 30 and a criminal history category of IV, the PSI calculated an initial Sentencing Guidelines range of 135-168 months of imprisonment. Because Samuel was subject to a statutory minimum, 15-year prison term under Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), his Guidelines range became 180 months.

Samuel objected to the application of the ACCA. He contended his prior convictions for sale or possession with intent to sell or deliver a controlled substance, in violation of Fla. Stat. § 893.13, did not qualify as ACCA-predicate "serious drug offenses," because they did not require knowledge of the illicit nature of the substances. For the same reasons, he argued his § 893.13 convictions did not qualify as "controlled substance offenses" under § 2K2.1(a)(2), to qualify him for a base offense level of 24. Absent the improper enhancements, his

Guidelines range should have been based on an offense level of 12 and a criminal history category of III.

During Samuel's sentencing hearing, he renewed his objection to the ACCA sentence enhancement. He argued that applying the categorical approach, as required by *Descamps v. United States*, 133 S. Ct. 2276 (2013), and *United States v. Robinson*, 583 F.3d 1292 (11th Cir. 2009) (per curiam), to an "indivisible" statute such as § 893.13 entails no more than comparing the elements of the offense of conviction to "the generic offense of possession with intent to distribute." ROA at 230. He contended the generic offense required knowledge of the illicit nature of the substance. Florida is one of only two states that does not include this mens rea requirement. Because § 893.13 criminalizes a broader range of conduct than the generic offense, Samuel argued it never can qualify as an ACCA-predicate. The absence of a mens rea requirement from the ACCA's plain language is not dispositive, because it does not exempt the required application of "the formal categorical approach to determine what are the elements of the generic offense." ROA at 232.

The district judge overruled Samuel's ACCA objection. The judge explained the § 924(e) definition of "serious drug offense" is "an offense under state law involving manufacturing, distributing, or possessing with intent to distribute a controlled substance." R. at 236. Thus, despite Florida's elimination

7

of a mens rea requirement from § 893.13, a conviction under that statute still qualified as an ACCA predicate.

Samuel's counsel agreed he was subject to a 15-year minimum sentence. He also renewed all prior objections, including those in his PSI objections. The judge stated he had "considered the statements of all parties, the presentence report which contains the advisory guidelines and the statutory factors." ROA at 237. The judge calculated an offense level of 30, a criminal history category of IV, and a mandatory minimum sentence of 180 months. The judge sentenced Samuel to 180 months of imprisonment, to be followed by 5 years of supervised release. Samuel renewed his prior objections and also objected to the "procedural necessity" of the sentence. ROA at 238.

Samuel argues on appeal the district judge erred in finding each of the following was independently sufficient to justify a *Terry* stop: (1) one officer's observation of a bulge near Samuel's waistband; and (2) the officers' desire to question him in connection with a homicide investigation. Samuel contends the officers lacked reasonable suspicion to believe he had participated in the homicide, and no exigent circumstances justified the stop. Samuel further asserts the officers' "source of information" did not identify him as a participant in the homicide. Reply Br. at 3 (citation and internal quotation marks omitted). Nor did

the officers identify specific, objective facts on which to base a belief that Samuel may be armed and dangerous.

Samuel also argues his prior § 893.13 convictions do not qualify as ACCA-predicate "serious drug offenses." Samuel notes, in *Donawa v. U.S. Att'y Gen.*, 735 F.3d 1275 (11th Cir. 2013), we held a person may be convicted under Florida's possession-with-intent statute without knowledge of the nature of the substance in his possession. The federal drug trafficking statute, however, requires such knowledge. Samuel contends § 893.13 is a "non-generic" offense under the "categorical approach" and, consequently, cannot qualify as an ACCA-predicate offense. Appellant Br. at 25, 28. He further argues we have rejected the label-based approach suggested by the government, in *United States v. Palomino Garcia*, 606 F.3d 1317 (11th Cir. 2010).

## II. DISCUSSION

A. <u>Motion to Suppress</u>

We review a district judge's denial of a motion to suppress under a mixed standard; we review the judge's findings of fact for clear error and his application of the law to those facts de novo. *United States v. Gordon*, 231 F.3d 750, 753-54 (11th Cir. 2000). When considering a ruling on a suppression motion, all facts are construed in the light most favorable to the prevailing party. *Id.* at 754.

The Fourth Amendment protects individuals from unreasonable searches and seizures by government authorities. *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Officers may stop and briefly detain a person to investigate a reasonable suspicion of criminal activity even though probable cause may be lacking. *See Gordon*, 231 F.3d at 754 (citing *Terry*, 392 U.S. 1, 88 S. Ct. 1868). Similarly, if police "have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony," a *Terry* stop may be made to investigate that suspicion. *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 680 (1985). When determining whether reasonable suspicion exists, the judge must review the totality of the circumstances to ascertain whether officers had a particularized and objective basis to suspect legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002).

In connection with a *Terry* stop, an officer may conduct a pat-down search if he has reason to believe his own safety or the safety of others is at risk. *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010). The officer need not be certain an individual is armed, so long as a reasonably prudent person in the circumstances would be entitled to believe his safety or that of others is in danger. *Id.* at 1202-03.

Based on the totality of the circumstances, reasonable suspicion justifying an investigatory stop of Samuel was present. *See Arvizu*, 534 U.S. at 273, 122 S. Ct. at 750; *Gordon*, 231 F.3d at 754. When they encountered Samuel, Sgt. Prospere and Detective Passmore were engaged in the investigation of a homicide in which the victim had been shot several times. They had received information that Samuel had sent threatening text messages to the victim, and various individuals had identified Samuel as having been involved in the homicide. Detective Passmore identified Michael Miller, who told officers on the day of the encounter (1) that Samuel was part of a group of people with whom the homicide victim "supposedly had some issues" related to money, and (2) where Samuel could be found. ROA at 209.

When they first saw Samuel, whom Sgt. Prospere knew from their prior history, Detective Passmore warned Sgt. Prospere about a bulge. Based on the prior information potentially connecting Samuel to a shooting homicide, the officers then were entitled to believe their safety was at risk, which justified a pat-down. *See White*, 593 F.3d at 1202. Regardless of whether a *Terry* stop was justified before the officers became aware of the bulge, the stop was not effected until after Detective Passmore saw the bulge. When viewed in context with the information connecting Samuel to a shooting homicide, the presence of the bulge gave rise to reasonable suspicion he was involved in the homicide and potentially

11

was armed and dangerous. *See Arvizu*, 534 U.S. at 273, 122 S. Ct. at 750; *Hensley*, 469 U.S. at 229, 105 S. Ct. at 680; *White*, 593 F.3d at 1202-03.

Samuel's reliance on our decision in *United States v. Valerio*, 718 F.3d 1321 (11th Cir. 2013), is misplaced. In *Valerio*, Drug Enforcement Administration ("DEA") agents began conducting surveillance of the defendant, Valerio, after he visited a hydroponic-gardening store. *Valerio*, 718 F.3d at 1322-23. After failing to uncover evidence of drug activities, two DEA agents visited Valerio at his home, where they blocked his exit, approached him with guns drawn, performed a full-body pat-down, and subjected him to questioning, whereupon Valerio admitted to growing marijuana. *Id.* We held the officers' seizure of Valerio fell outside of the *Terry* exception to the probable-cause requirement, because (1) the encounter occurred nearly one week after the officers had last observed Valerio; and (2) no contemporaneous observations of him required swift action. *Id.* at 1324-25.

Unlike the case in *Valerio*, the officers in this case had information connecting Samuel to a particular crime. *See Hensley*, 469 U.S. at 229, 105 S. Ct. at 680. Moreover, Detective Passmore's observation of a bulge permitted a pat-down in the interest of safety, particularly when viewed in context of a shooting homicide investigation in which Samuel was a suspect. *See White*, 593 F.3d at 1202. In contrast, nothing in *Valerio* suggested Valerio was a suspect or person of interest in a particular crime, much less a violent one, or that there was any reason

12

to believe he may have been armed at the time of the stop-and-frisk. *See Valerio*, 718 F.3d 1321. Samuel has not shown the district judge erred when he denied Samuel's motion to suppress.

B. Armed Career Criminal Act

We review de novo whether a prior conviction qualifies as an ACCA "serious drug offense." *Robinson*, 583 F.3d at 1294. Under the ACCA, a defendant convicted under § 922(g) is subject to a mandatory-minimum, 15-year prison sentence if he has 3 prior convictions for serious drug offenses committed on separate occasions. 18 U.S.C. § 924(e)(1). A "serious drug offense" is defined, in relevant part, as "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . , for which a maximum term of imprisonment of ten years or more is prescribed by law." *Id.* § 924(e)(2)(A)(ii). In determining whether a conviction qualifies as an ACCA-predicate offense, judges generally apply a categorical approach and look no further than the fact of conviction and the statutory definition of the crime. *Robinson*, 583 F.3d at 1295.

The Florida cocaine statute in this case provides that "a person may not sell, manufacture, or deliver, or possess with intent to sell, manufacture, or deliver, a controlled substance." Fla. Stat. § 893.13(1)(a). A violation of § 893.13(1)(a) involving cocaine is a second-degree felony, punishable by up to 15 years of

13

imprisonment. *Id.* § 893.13(1)(a)(1) (cross-referencing *id.* §§ 775.082(3)(c),

893.03(2)(a)(4)).  Before 2002, Florida courts interpreted § 893.13 as including a

requirement that the defendant knew of the illicit nature of the drugs in his

possession. *See Shelton v. Sec'y, Dep't of Corr.*, 691 F.3d 1348, 1349-50 (11th

Cir. 2012), *cert. denied*, 133 S. Ct. 1856 (2013).  In May 2002, the Florida

Legislature enacted Fla. Stat. § 893.101, which eliminated knowledge of the illicit

nature of the controlled substance as an element of controlled-substance crimes and

created an affirmative defense of lack of knowledge of the illicit nature of the

substance. *Id.* at 1350.  The amendment did not, however, eliminate the element of

knowledge of the presence of the substance. *Id.*

The question presented in *Descamps* was whether a sentencing judge may

examine certain documents to determine whether a prior conviction for a crime

with a single, indivisible set of elements qualifies as a "violent felony" under the

ACCA's enumerated-offenses provision, 18 U.S.C. § 924(e)(2)(B)(ii).[2] *See*

*Descamps*, 133 S. Ct. at 2281-83.  When faced with a prior conviction for violating

an indivisible statute, one not containing alternative elements, the Supreme Court

concluded sentencing judges may apply only the "categorical approach," which

---

[2] This subsection defines "violent felony" as a crime that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B)(ii).

14

entails no more than comparing the elements of the statute forming the basis of the prior conviction with the elements of the "generic" version of that crime. *See id.*

In *Donawa*, we held the petitioner's prior conviction for possession with intent to sell or deliver cannabis, in violation of § 893.13(1)(a)(2),[3] as amended by § 893.101, did not qualify as an "aggravated felony" under the Immigration and Nationality Act ("INA"). *See Donawa*, 735 F.3d at 1279, 1283-84. We first concluded § 893.13(1)(a)(2) is an "indivisible" statute. *Id.* at 1283. To determine whether it qualifies as an "aggravated felony" under the INA, judges may apply only the categorical approach. *Id.* at 1282-83. Relevant to the facts in *Donawa*, the definitions of "aggravated felony" included a "drug trafficking crime" as defined in 18 U.S.C. § 924(c). *Id.* at 1280; *see also* 8 U.S.C. §§ 1101(a)(43)(B), 1227(a)(2)(A)(iii); 18 U.S.C. § 924(c)(2). Under § 924(c)(2), "drug trafficking crime" is defined, in relevant part, as "any felony punishable under the Controlled Substances Act (21 U.S.C. [§] 801 et seq.)." 18 U.S.C. § 924(c)(2).

Applying the categorical approach, we determined in *Donawa* that the least of the acts criminalized by § 893.13(1)(a)(2) did not require knowledge of the nature of the substance in one's possession. *Donawa*, 735 F.3d at 1281. The

---

[3] Subsection (1)(a)(2) of § 893.13 applies to offenses involving various controlled substances other than cocaine. *See* Fla. Stat. § 893.13(1)(a)(2) (cross-referencing various subsections of *id.* § 893.03). A violation of § 893.13(1)(a)(2) is punishable by up to five years of imprisonment. *See id.* § 893.13(1)(a)(2) (cross-referencing *id.* § 775.082(3)(d)). Subsections (1)(a)(1) and (1)(a)(2) otherwise are materially identical. *See id.* § 893.13(1)(a)(1), (1)(a)(2).

15

"federal analogue" of the Florida statute, 21 U.S.C. § 841(a)(1), which is among the drug trafficking offenses listed in § 924(c)(2), requires the government to show the defendant knew of the nature of the substance in his possession. *Id.* We concluded, § 893.13(1)(a)(2) did not qualify as a "drug trafficking aggravated felony" under the INA. *Id.* at 1283.

The definition of "serious drug offense" in § 924(e) does not require knowledge of the illicit nature of the controlled substance to have been an element of a prior state crime. *See* 18 U.S.C. § 924(e)(2)(A)(ii). All that is required is that the prior state crime (1) involved manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance, and (2) carried a maximum prison term of ten years or more. *See id.* A violation of § 893.13(1)(a) involving cocaine satisfies both of these requirements. *See* Fla. Stat. § 893.13(1)(a)(1) (cross-referencing *id.* §§ 775.082(3)(c), 893.03(2)(a)(4)).

Our decision in *Donawa* addressed the definitions of "aggravated felony" under 8 U.S.C. § 1101(a)(43)(B) and "drug trafficking crime" under 18 U.S.C. § 924(c). *Donawa*, 735 F.3d at 1279-84. Each of these terms are defined differently than the term "serious drug offense" under § 924(e)(2)(A)(ii). *See* 8 U.S.C. § 1101(a)(43)(B); 18 U.S.C. § 924(c), (e)(2)(A)(ii). Consequently, *Donawa* is inapplicable here.

16

Samuel's arguments concerning "generic" crimes likewise are misplaced. We addressed in *Donawa* whether § 893.13(1)(a)(2) fits within the "generic federal definition" in the context of subsection (c) of § 924, which is not at issue here. *See id.* at 1280-82. Subsection (c) defines "drug trafficking crime," as "any felony punishable under the Controlled Substances Act (21 U.S.C. [§] 801 et seq.)." 18 U.S.C. § 924(c)(2). Because the definition of the enhancement at issue in *Donawa* referred to specific federal crimes, we concluded a "drug trafficking crime" in § 924(c) must fit within the "generic federal definition" of one of those specific federal offenses, namely, 21 U.S.C. § 841(a), which was the "federal analogue" to § 893.13. *See Donawa*, 735 F.3d at 1280-81. The ACCA's definition of "serious drug offense," however, contains no such examples of "federal analogue" or other enumerated offenses. *See* 18 U.S.C. § 924(e)(2)(A)(ii); *Donawa*, 735 F.3d at 1281. The question of whether § 893.13 qualifies as a "generic" offense is inapplicable, because § 924(e)(2)(A)(ii) is self-defining without reference to any "generic" or otherwise enumerated offenses. *See* 18 U.S.C. § 924(e)(2)(A)(ii).

Samuel's reliance on our decision in *Palomino Garcia* also is misplaced. In *Palomino Garcia*, we addressed the Sentencing Guidelines definition of "crime of violence." *See Palomino Garcia*, 606 F.3d at 1325-37. In *Palomino Garcia*, we rejected a label-based approach to deciding whether a prior offense qualifies for sentence-enhancement purposes. *See id.* at 1330-31. Samuel's sentence

17

enhancement was proper, however, because the definition of § 893.13, based on its statutory text, satisfies the definition of "serious drug offense" in § 924(e)(2)(A)(ii), and not because of any label attached to § 893.13. Therefore, the district judge properly determined Samuel's post-2002 § 893.13 convictions qualified as ACCA-predicate offenses.[4]

**AFFIRMED.**

---

[4] In view of our determination that Samuel's post-2002 § 893.13 convictions qualified as ACCA-predicates, it is unnecessary to address Samuel's argument that his § 893.13 convictions did not qualify as "controlled substance offenses" under U.S.S.G. §§ 2K2.1 and 4B1.2.