[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 14-15602; 14-15707
Non-Argument Calendar
_____

D.C. Docket Nos. 1:14-cr-00025-DHB-BKE-1; 1:03-cr-00021-DHB-BKE-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL ANTHONY BROWN,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Georgia
_____

(January 11, 2016)

Before JULIE CARNES, JILL PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

After entering a conditional guilty plea, Michael Brown appeals the district court's denial of his motion to suppress evidence. Brown wished to suppress the heroin police found in a backpack inside his car, which led to his conviction for possession with intent to distribute heroin in this case and revocation of supervised release from a prior case.[1] Upon review of the record and consideration of the parties' briefs, we affirm.

## I.    FACTUAL BACKGROUND

The following facts were elicited at a magistrate judge's hearing on Brown's motion to suppress. Richmond County Sherriff's Office Sergeant William Leisey testified that, on September 4, 2013, a "trusted friend" (the "informant"), whom he had known for eight years, called him and reported that the informant had witnessed Brown selling heroin out of his restaurant, the Eros Bistro. Suppression Hr'g. Tr., Doc. 65 at 9.[2] The informant told Leisey that Brown lived in an apartment above the restaurant and carried heroin in a backpack with him everywhere he went. Leisey acknowledged that the tip neither predicted any future criminal behavior nor relayed any information concerning the amount of drugs Brown possessed, his comings and goings, or how the alleged sales transpired. But

---

[1] We consolidated these cases for purposes of appeal.

[2] "Doc." refers to the docket entry in the district court record in this case.

2

he testified that, based on his relationship with the informant, he "absolutely" believed the information was truthful. *Id.* at 11.

Leisey explained that the informant was the spouse of a friend whom he had known for fifteen years and that both were "dear family friends." *Id.* at 20. Leisey noted that he had entrusted the informant with his own child on numerous occasions. According to Leisey, the informant never had provided him with criminal tips in the past and did not receive any benefit or compensation for the tip. He did not run a criminal history check on the informant.

Leisey testified that he relayed the tip to Investigator P.J. Hambrick. According to Leisey, Hambrick advised that he had received similar information from another person. Leisey testified that Hambrick asked if he could get more information from the informant. Leisey contacted the informant, who sent him a photograph of Brown's car from Facebook and told him where Brown routinely parked.

Jason Kennedy, the narcotics investigator in this case, testified that he drove by Eros Bistro to confirm the description of Brown's vehicle and location after receiving details about the tip from Hambrick. Kennedy testified that, a few days later, while conducting surveillance on Brown with another investigator, he observed Brown exit his building with his wife and baby and a backpack.

3

Kennedy decided not to approach Brown at that time because he did not want the child involved.

Kennedy returned the next day and observed Brown drive up in his vehicle outside the building. Kennedy and his fellow investigator approached the vehicle to conduct an interview with Brown. During the evidentiary hearing, Kennedy admitted that while surveilling Brown he never saw Brown engage in any drug transaction, nor did he see any lookouts or drugs.

Nonetheless, according to Kennedy, Brown appeared very nervous upon seeing the officers; his eyes were large, he took a deep breath, and he had a "look of shock on his face like a deer in the headlights." *Id.* at 38. Brown leaned forward in his seat with his hands extended towards the floor of the car. Kennedy testified that, based on his experience, he believed Brown may have been putting something under the seat or reaching for a weapon. Kennedy observed a backpack sitting in the passenger seat of the vehicle. He testified that, after seeing Brown acting nervous with his backpack in the car, Kennedy "believe[d] that the tip had a very strong possibility of being very true and . . . just wanted to further investigate that." *Id.* at 44. Kennedy also testified that he believed the tip, plus his observations during the surveillance and his interaction with Brown when he approached, gave him reasonable suspicion to detain Brown briefly to investigate further.

4

Kennedy asked Brown if he could speak with him outside the vehicle. Kennedy then advised Brown of the tip the police had received and inquired whether Brown had any narcotics or weapons on him. Brown replied that he had none. Kennedy asked Brown if he could search the vehicle. When Brown asked him why, Kennedy explained that the police were searching the car because of the tip. Brown said nothing further, so Kennedy requested a canine unit to sniff for drugs in the vehicle.

After the canine unit arrived and the dog "alerted" to the vehicle, the officers searched the vehicle and discovered a .38 caliber revolver lying on the driver's side floorboard. The gun was located in the same general area Brown had been leaning toward, positioned "like it had just been placed there," according to Kennedy. *Id.* at 40. The officers then arrested Brown for possession of a firearm by a convicted felon.

At the evidentiary hearing, Brown agreed with the government that once the narcotics dog alerted to the car, there was probable cause to search the car. After placing Brown in custody, the officers also searched the backpack on the passenger seat, revealing twenty-one aluminum foil packets of heroin, other plastic baggies with heroin, several prescription bottles in Brown's name containing various pills, a digital scale, plastic tubing, a spoon, and syringes. After Brown gave the officers permission to search his apartment, the officers discovered .38 caliber ammunition

and several empty clear plastic baggies of the type commonly used to package narcotics.

Brown was indicted on three counts: (1) possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1); (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 942(c); and (3) possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2).  At the time of this offense, Brown was under a term of supervised release for his 2003 convictions for possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g).  As a result of his arrest in the heroin case, Brown was charged with violating the conditions of his supervised release, and the parole officer initiated revocation proceedings.

Brown filed a motion to suppress all of the evidence seized on the ground that the officers lacked reasonable suspicion to conduct the investigatory stop.  He argued that the informant's tip was insufficient to create reasonable suspicion of criminal activity and that the officers failed to observe anything that, in conjunction with the informant's tip, would give rise to reasonable suspicion of criminal activity.

After supplemental briefing, the magistrate judge issued a report and recommendation that the motion to suppress be denied.  Over Brown's objections,

6

the district court adopted the report and recommendation in its entirety and denied the motion to suppress.

Brown subsequently entered a conditional negotiated guilty plea to Count 1, possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), expressly reserving the right to appeal the denial of his motion to suppress in exchange for the government's agreement to dismiss the remaining counts.

At sentencing, the district court addressed both the instant offense and the revocation of Brown's supervised release in the 2003 case. The district court imposed within-guidelines sentences of 188 months' imprisonment in the heroin case and 41 months' imprisonment in the revocation case, to be served concurrently, followed by three years of supervised release. Brown now appeals.

## II.    STANDARD OF REVIEW

When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its application of the law to those facts *de novo* while construing the facts in the light most favorable to the prevailing party below—here, the government. *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012). A district court's choice between two permissible views of the evidence cannot be clear error. *United States v. Ndiaye*, 434 F.3d 1270, 1305 (11th Cir. 2006).

### III.   MOTION TO SUPPRESS

At the evidentiary hearing, the government acknowledged that the officers detained Brown when they ordered him to speak with them outside of his car. Brown agreed with the government that there was probable cause to search his car once the narcotics dog alerted to the car. Although Brown challenges the entirety of the search, the key issue is whether the officers had reasonable suspicion to make the initial stop based on the informant's tip and any information corroborated by the officers.

### A.   Reliability of the Tip

Consistent with the Fourth Amendment, law enforcement may conduct a brief warrantless investigatory stop of an individual "where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop was reasonably related in scope to the circumstances which justified the interference in the first place." *Lewis*, 674 F.3d at 1303 (internal quotation marks omitted). Reasonable suspicion exists when an officer has a "particularized and objective basis" for suspecting a person of criminal activity, given the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "Reasonable suspicion need not involve the observation of illegal conduct, but does require more than just a hunch." *Lewis*, 674 F.3d at 1303 (internal quotation marks omitted).

8

When examining whether an informant's tip was reliable enough to give rise to an officer's reasonable suspicion, the totality of the circumstances includes the reliability of the informant and of the tip.  The lower the reliability of the informant, the higher the reliability of the tip must be, and vice versa.  *See Alabama v. White*, 496 U.S. 325, 330 (1990).  Construing the evidence in the light most favorable to the government, we conclude that the district court did not err in denying Brown's motion to suppress.

1.    The Informant

First we evaluate the reliability of the informant.  When an informant is known to an officer personally, the officer may act "justifiably in responding to his informant's tip." *Adams v. Williams*, 407 U.S. 143, 146 (1972).  Sergeant Leisey had known this informant for the better part of a decade and entrusted the informant with his child.  According to Leisey, the informant was trustworthy and had never lied to him.  As the magistrate judge noted, "it is difficult to imagine an informant who could be better known to the police."  Doc. 40 at 9.  Such a known informant presents "a stronger case than . . . . in the case of an anonymous telephone tip" and may alone be sufficient to justify an investigatory stop.  *Adams*, 407 U.S. at 146.

It is true that Kennedy was unable to speak to the informant face-to-face—if he had, it would make the informant even more reliable.  *See United States v.*

9

*Heard*, 367 F.3d 1275, 1279 (11th Cir. 2004) (noting that face-to-face anonymous tips demand less scrutiny "because the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant"). That said, we consider an officer's ability to locate an informant at a later date to be an indicator of reliability. *See id.* at 1279. Here, when Investigator Hambrick requested more information, Leisey contacted the informant again and subsequently received a picture of Brown's car and the location where Brown normally parked.

The informant does deserve some degree of scrutiny because he or she had not given a tip to the police before. Officials may, without rigorous scrutiny, trust tips from an "unquestionably honest citizen" who has previously provided tips that "would subject [him or her] to criminal liability" if false. *Illinois v. Gates*, 462 U.S. 213, 233 (1983). Despite the fact that this was the informant's first tip to the police, we agree with the district court that the informant was reliable enough to create reasonable suspicion, especially considering the reliability of the tip, which we discuss next.

2.    The Tip Itself

When an officer's purported reasonable suspicion is based solely on a third party's tip, as was the case here, we determine whether the tip itself bore sufficient indicia of reliability to support reasonable suspicion. *White*, 496 U.S. at 330-31.

10

In this case, the tip was reliable enough despite consisting mainly of observable facts and failing to predict future behavior because it described Brown's usual business practice and included an eyewitness account of the crime.

"[A] known, albeit unproven, informant coupled with subsequent corroboration of the tip's details can justify a reasonable suspicion of criminality." *United States v. Kent*, 691 F.2d 1376, 1380 (11th Cir. 1982). Here, Officer Kennedy confirmed significant facts provided by the informant. The informant correctly notified the police of the color, make, model, and location of Brown's car, that Brown always carried a backpack, and that Brown lived above Eros Bistro.

Brown argues that the police lacked reasonable suspicion because they corroborated the tip only via presently observable facts. A tip that relays only presently observable facts "might not be sufficient in and of [itself] to lend the necessary credence to the informant's tip to create a reasonable suspicion of drug trafficking." *United States v. Lee*, 68 F.3d 1267, 1271 (11th Cir. 1995). In *Lee*, we considered a tip that provided a description of an alleged drug dealer, where he was staying, the car he drove, where the car would be parked, and that he would travel with a woman and a child. *Id.* at 1269. The informant also disclosed that the dealer's "usual business practice" was to meet with local distributors and drive their vehicles, rather than his own, to avoid suspicion. *Id.* Although the

11

description and location of the car were "presently observable facts," we concluded that the tip was sufficiently reliable considering that it had also predicted the dealer's business routine.  *Id.* at 1271-72.

Here, the police corroborated presently observable facts such as the description and location of Brown's car.  Such information was "readily available to many persons" and could "easily have been obtained from an offhand remark heard at a neighborhood bar."  *Kent*, 691 F.2d at 1380 (internal quotation marks omitted).  In fact, the informant described the car based on a picture found on Facebook.  But, as in *Lee*, the informant's tip also confirmed Brown's usual business practice.  The tip correctly described that Brown sold heroin out of a backpack he carried "everywhere he goes."  Doc. 65 at 29.  And the backpack was observed in the passenger seat.  Accordingly, the tip was sufficiently reliable to create reasonable suspicion.

The tip also exhibited reliability because the informant personally witnessed Brown dealing drugs.  "The courts have traditionally viewed information drawn from an ordinary witness or crime victim with considerably less skepticism than information derived from anonymous sources."  *United States v. Martinelli*, 454 F.3d 1300, 1307 (11th Cir. 2006).  When an informant has personal knowledge of the crime, including viewing the crime in progress, "[t]hat basis of knowledge lends significant support to the tip's reliability."  *Navarette v. California*, 134 S.

12

Ct. 1683, 1689 (2014); *see Gates*, 462 U.S. at 234. Therefore the informant's claim of first-hand knowledge of Brown's crime further indicates the reliability of the tip.

We acknowledge that the tip failed to predict future behavior. Previously we have held that an informant's tip may be sufficiently reliable to create reasonable suspicion when officers can corroborate the "prediction of future conduct" contained within the tip. *Lee*, 68 at 1272. In *J.L.*, the Supreme Court held that an anonymous, "bare" report that a young black man in a plaid shirt at a bus stop had a gun could not be reliable, in part because the tip failed to predict the alleged criminal's future conduct. *Florida v. J.L.*, 529 U.S. 266, 271 (2000). In this case, the tip did not predict Brown's behavior; it only provided past or present information. As such, the tip is less reliable than if it had predicted Brown's future actions. We do not suggest, however, that tips must always predict future behavior to be reliable. Prediction is but one indicator of reliability.

Brown's reliance on this Court's decision in *United States v. Valerio* as a basis for reversal is misplaced. 718 F.3d 1321 (11th Cir. 2013). In *Valerio*, a Drug Enforcement Administration ("DEA") agent witnessed Valerio shopping at a hydroponics store and surmised, based on the circumstances, that Valerio likely was growing marijuana. *Id.* at 1322. On Valerio's second visit to the store, DEA agents followed him to a warehouse suitable for growing marijuana. *Id.* DEA

13

agents failed to observe any suspicious or criminal activity during one week of surveillance over Valerio. *Id.* at 1322-23. A narcotics dog sniffed parts of the warehouse, but only alerted to bays rented by people other than Valerio. *Id.* The police subsequently conducted a "voluntary citizen encounter" with Valerio by blocking his vehicle in the driveway, approaching his car with guns drawn, and performing a pat down search before questioning him about the warehouse. *Id.* at 1323. Valerio then admitted to growing marijuana in the warehouse. *Id.* We reversed the district court's denial of Valerio's motion to suppress evidence that led to his arrest. *Id.* at 1325. The one-week delay between the agents' observations of Valerio and his arrest "and the complete absence of any contemporaneous observations of Mr. Valerio that would necessitate 'swift' law enforcement action . . . made it entirely practicable for law enforcement officers to proceed with their investigation in a manner consistent with the default requirements of the Fourth Amendment." *Id.* at 1325.

Contrary to *Valerio*, in this case the police acted on more than a hunch that Brown was engaged in criminal activity. Rather, the police received a reliable tip from an informant who witnessed Brown selling heroin from a backpack that he always carried with him. Although the officers waited approximately one week before conducting the investigatory stop, this is not a basis for per se reversal, even

14

in the light of *Valerio*, because the police had reasonable suspicion that criminal activity was afoot based on the tip and the presence of the backpack in the car.

Despite the tip's lack of predictive power, the tip was reliable because the informant witnessed Brown selling drugs and the police corroborated presently observable facts, including Brown's usual business practice.

\* \* \*

Considering the totality of the circumstances and viewing the facts in the light most favorable to the government, we conclude that the tip was sufficiently reliable to give rise to reasonable suspicion.

B.      Refusal to Consent to the Search

Brown further argues that he was detained in violation of the Fourth Amendment solely because he refused to consent to the search of his car. Because Brown failed to raise this argument below, it is subject to review for plain error. *United States v. Young*, 350 F.3d 1302, 1305 (11th Cir. 2003). To prevail under the plain error standard, Brown must demonstrate that there was error; the error was plain; the error affected his substantial rights; and the error seriously affected the fairness, integrity, or reputation of the judicial proceedings. *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005).

We previously held that "[t]he police cannot base their decision to prolong a traffic stop on the detainee's refusal to consent to a search." *United States v.*

*Boyce*, 351 F.3d 1102, 1110 (11th Cir. 2003). But, "when the police have already observed, before asking for permission to search, facts sufficient to raise a reasonable suspicion," an officer may detain a suspect even after a refusal to consent. *Id.*

Here we see no error, plain or otherwise. Although Brown argues that the officers only searched the car after he attempted to leave, he has offered no evidence to support his argument. As discussed above, the record demonstrates that Brown was detained because the officers had reasonable suspicion that he had heroin in his backpack. Thus, the district court did not err in denying Brown's motion to suppress.[3] Accordingly, we affirm Brown's conviction and sentence. Consequently, we also affirm the revocation of his term of supervised release in the 2003 case.

**AFFIRMED.**

---

[3] Brown asserts that because the revocation of his supervised release in his 2003 case was based on the underlying criminal charge stemming from the invalid search, this Court must vacate the revocation. Because we conclude that the search was valid, we reject Brown's argument.